STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. WADE HAMPTON, DEFENDANT-APPELLANT.

Argued April 25 and May 8, 1972—Decided July 17, 1972.

*Mrs. Laura L. Cantor,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney, on the brief).

*Mr. Alfred J. Luciani,* Deputy Attorney General, argued the cause for respondent (*Mr. George F. Kugler,* Attorney General, attorney).

*Mr. Gerard J. Di Nicola,* Prosecutor of Salem County, filed a brief on behalf of respondent.

The opinion of the Court was delivered by

FRANCIS, J. Defendant Hampton was convicted of kidnapping, *N. J. S. A.* 2A:118-1, breaking and entering and larceny, *N. J. S. A.* 2A:94-1 and 2A:119-2, carrying a concealed weapon, *N. J. S. A.* 2A:151-41, atrocious assault and battery, *N. J. S. A.* 2A:90-1 and 2A:151-5, and receiving a stolen automobile, *N. J. S. A.* 2A:139-3. The following sentences were imposed: 30-35 years in State Prison for kidnapping, breaking and entering 3-5 years, larceny 1-3 years, both terms to be served concurrently with the kidnapping sentence; 1-3 years for carrying a concealed weapon, 3-5 years for atrocious assault and battery, 3-5 years for receiving a stolen automobile; execution of these last three sentences was suspended. The conviction was affirmed in the Appellate Division in an unreported opinion. However, the 30-35 year sentence was modified to 30 years without any minimum and maximum specification. We granted defendant's petition for certification. *State v. Hampton,* 59 *N. J.* 263 (1971). In this Court defendant's appeal raises four contentions: (1) that the trial court erred in its charge to the jury on the issue of voluntariness of defendant's confession, and in refusing to charge as requested on the subject; (2) the kidnapping statute violates the Eighth Amendment ban of the Federal Constitution against cruel and unusual punishment; (3) it also violates the due process and equal protection clauses of the Fourteenth Amendment, and

(4) the facts proved by the State do not warrant a conviction for kidnapping.

I

On July 20, 1968, at about 10:20 P.M., Mrs. Mary Rayborn, a widow, returned to her apartment on South Main Street, Woodstown. Upon entering she began to look for a note which was to have been left by her two sons. While doing so she heard a voice say "Hold it, lady, don't move." Turning around she saw a man standing near the door holding a gun in his hand. She started to walk toward him and was told again "Don't move, lady." She offered to give him whatever money she had and anything else he wanted in the apartment, if he would leave. The man, who later turned out to be Hampton, refused saying he could not leave her there as there were too many telephones in the apartment. Then he told her she would have to drive him out of town. She replied that she was very nervous but would drive him to a neighboring community. Following instructions she walked out the door, Hampton following with the gun in her back. As they proceeded toward the parking area where her car had been left she saw another man standing nearby and considered yelling to him but the gun at her back deterred her. At the parking lot she noticed that Hampton was carrying a "long rifle" as well as the hand gun. This caused abandonment of all thoughts of escape.

They got into her car at which time defendant tried to summon the man who was standing nearby. Although a confederate, he did not join them. That person was arrested later with Hampton in connection with a stolen car in which the two men had come into town. He was not on trial in this case nor did he testify. Mrs. Rayborn under revolver threat drove out of the parking lot. In following directions she realized Hampton was not familiar with the area, so she turned down a street where she had an acquaintance and slowed down. An immediate order to drive faster followed,

accompanied by a direction to keep off the main roads. After continuing for a while she was instructed to stop as they neared a lake. Fearful of her life she said it was a Boy Scout camp and usually there were boys camping there. Thereafter, defendant noticed a dirt road running off the main road and ordered her to turn into it. She did not turn but immediately after passing the road the gun was pushed into her side and she was told to stop. Then she was ordered to back into a driveway and stop. She was very nervous, and asked him if she could take a pill because she had a bad heart. He allowed her to do so but told her to turn off the car headlights. She did so but was so "terribly frightened" that she put them back on, whereupon he put the gun to her side again and told her he would not harm her if she kept them off. She smoked a cigarette, gave Hampton one and kept talking to him.

They began to drive around again and they came to a section populated largely by blacks. (Hampton is a black). Mrs. Rayborn suggested that he get out there but he refused. After a while she realized they were headed back toward Woodstown and told Hampton she would take him to the center of town where he could have the car and $20, and she would walk home. Hampton said he would think about it, but on arrival in town apparently he changed his mind, She stopped behind a parked car near a church and he said "Move, lady, there is somebody in that car." She continued on a short distance and stopped again saying she was too nervous and upset to go on and wanted to get out. She took $20 out of her purse and being too frightened to hand it to him, she placed it on the seat at the same time trying to give him directions about getting out of town. But he said "Lady, you drive me out of town and then I will let you go." She thought to herself that if he did not let her get out, she was probably going to be shot anyway and she would rather be shot there in town. As he said to her "I am sorry lady, I can't afford to let you go," she undertook to open the car door, and heard the gun go off. She felt a sting

in her right arm and on reaching for that area found her hand covered with blood. She ran across the street yelling "I have been shot," and finally gained admittance to an old ladies home a short distance away. In a short time the police arrived and took her to a nearby hospital where she remained overnight. The bullet had entered her arm and lodged itself near the collar bone. For medical reasons a decision was made not to remove it, and she still carries it there.

The record reveals that Mrs. Rayborn had driven defendant around for about an hour before she was shot.

The following morning a son of Mrs. Rayborn drove her from the hospital to Woodstown Borough Hall. There she saw two men seated in a room off the main hallway, and identified Hampton as the person who forced her to drive him around and who shot her. On seeing her Hampton said he was sorry and that he did not mean to hurt her.[1]

An unusual circumstance was responsible for the presence of the two men at the Borough Hall. During the previous evening a person identifying himself as James Ellis (actually Marvin S. Ellis, Hampton's companion who remained outside Mrs. Rayborn's apartment while he entered it) reported a stolen car. The car found in Woodstown was owned by Harvey Vincent of Wilmington, Delaware, who had reported it stolen. As it developed this was the car that Ellis and Hampton drove into Woodstown and left at a gas station while they went looking for some means of getting money to buy gasoline. Later that evening Sergeant Harold Bulford of the Borough saw Ellis and Hampton at a bus stop. Ellis told Bulford that he had seen a man running from the stolen car and both men offered to help look for him. After touring around unsuccessfully for a while the

---

[1] Mrs. Rayborn unhesitatingly identified Hampton again at the trial. Propriety of both the out-of-court and in-court identifications was challenged in the Appellate Division. The challenge was properly rejected there, and is not repeated in this Court. See *State v. Earle*, 60 *N. J.* 550 (1972).

two men asked to be driven to Salem, a nearby town. On the way there they transferred to a Salem police car, and requested and were granted permission to stay overnight in the Salem City jail. Early the following morning Bulford advised the Salem Police he wanted the men for questioning about the stolen car, and around 7:00 A.M. brought them back to Woodstown. This action was taken because shortly after midnight an examination of the stolen car by a fingerprint expert disclosed fingerprints of both Hampton and Ellis on it. It appears also that after Mrs. Rayborn had been hospitalized, search of her car by Bulford revealed a $20 bill on the front seat and on the floor a rifle belonging to one of her sons, which Hampton had taken from her apartment.

At the Borough Hall Bulford advised the men fully of their *Miranda* rights. Neither one requested an attorney. About a half hour later Hampton agreed to waive his *Miranda* rights and to give a statement; and he signed such a waiver. At about this time Hampton was told he was suspected of atrocious assault and battery, breaking and entering and larceny. That the waiver he signed contained complete *Miranda* warnings is not questioned; nor is the sufficiency of the waiver form attacked as inadequate. It said:

> I have read the statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

The time sequence between the giving of the warnings and Hampton's waiver and the giving of his statement and Mrs. Rayborn's identification is not certain from the record. The statement was made at 10:20 A.M. and Mrs. Rayborn said at the trial her identification of Hampton took place in the late morning.

Prior to the statement Hampton and Ellis were allowed to hold a conversation alone. A short time later Ellis gave

a statement implicating Hampton, as the result of which the hand gun used to shoot Mrs. Rayborn was located. After being informed of Ellis' statement and shown the gun which Hampton then identified, he volunteered to discuss the matter. Before doing so he was again given the *Miranda* warnings and the incriminatory statement followed their repetition. See *State v. Magee*, 52 *N. J.* 352, 374 (1968), *cert.* den. 393 *U. S.* 1097, 89 S. Ct. 891, 21 *L. Ed.* 2d 789 (1969). The details were substantially in accord with Mrs. Rayborn's testimony already outlined, except that in describing the shooting incident he said "When she started to get out [of the car] I jumped and the gun went off as I was trying to get out of the car."

When the prosecutor called Sergeant Bulford to the witness stand, the parties and the court being aware that his testimony would involve Hampton's statement, the jury was excused until the issue of its voluntariness was decided. Bulford's testimony on the subject was given in accordance with the factual outline already set forth. During this hearing Hampton also testified, and it may be said fairly that he raised no substantial conflict with respect to the *Miranda* warnings, his execution of the waiver and his willingness to give a statement. In fact he testified on cross-examination:

> Q And when you learned of the statement by Ellis, it was then that you started to make your statement, is that not correct?
> A That is when I was asked to make a statement.
> Q You didn't voluntarily make this statement?
> A I volunteered after I was asked.
> Q You volunteered, did anybody force you to make this statement?
> A No, they didn't.
> Q You knew what you were doing at all times, did you not?
> A I refuse to answer that on the grounds that it may incriminate me.

Some discussion followed between court and counsel during which the court said: "The question was, did you make this statement voluntarily and he said, yes. That is not an im-

proper question * * *." Then the court said: "I have heard enough testimony with respect to this. I find that the statement is admissible." It is clear that the necessary finding of voluntariness was made, and that it was amply supported by the testimony.

The trial then continued in the presence of the jury and Sergeant Bulford repeated his testimony respecting the *Miranda* warnings, the waiver and the giving and signing of the statement by Hampton. The statement was then offered in evidence and objected to by defense counsel who advised that his client was not going to testify on the subject. The court, as already noted, having found the statement voluntary and admissible, out of the presence of the jury, should simply have overruled the objection and had the statement marked in evidence. However, probably motivated by the rule which prohibits a trial judge from advising the jury of his earlier finding out of their presence that the confession was voluntary, he told the jury that the statement was admissible and that he would not decide "on the voluntariness of the statement." Continuing he said:

That is your function. You will decide from the testimony that you have heard and which you will hear later and from all the circumstances that are brought forth whether or not this is a voluntary statement. If you find it voluntary you may give it such weight or value as you desire. If you find it is not voluntary you should disregard and shall disregard it. All I am ruling on right now is that the statement will be admissible in evidence.

After some additional corroborative testimony on the voluntariness of the statement, Hampton's fingerprints, and the finding of the stolen rifle in Mrs. Rayborn's car, the State rested. The defense followed suit without calling any witnesses.

Before summation defense counsel handed the court a six page typewritten document entitled "Request to Charge." It contained 10 unnumbered paragraphs constituting a disquisition on the general state of the law respecting admis-

sibility of confessions. About two pages were devoted to an elaborate definition of voluntariness. The court declined to read this paper to the jury, and at the conclusion of the charge defense counsel noted his objection saying:

* * * I would ask the Court at least to read that part of the charge I submitted which included a definition of voluntariness. I feel it is crucial and essential and an integral part of this case. I feel we are entitled to have the jury know the voluntariness. That to an extent is a term of art and have it defined for them.

The court replied that it had covered the issue of voluntariness sufficiently, and it did not "have the time to pick out the particular spots [from the request] that I would wish to charge."

Examination of the charge shows that the court did define fully and fairly the term "voluntary" in substantially the language of one paragraph of the request to charge, and also referred specifically to the obligation on the part of the State to show that defendant's confession was the expression of his own free will and not induced by the pressure of force or fear or the influence of hope or promise of some benefit. In addition the charge discussed the testimony that Hampton had been advised of his rights on two occasions and that he understandingly signed the waiver (which contained a correct statement of the *Miranda* warnings and a proper form of waiver, and which the jury would have in the jury room with them) before giving and signing the confession.

In the Appellate Division defendant took and now in this Court continues on a different tack. The trial court's definition of voluntary is not assailed. Instead error is charged because of the failure to charge the following paragraph from the fifth page of the request:

With regard to the alleged statement of the defendant, you must first determine whether the State has affirmatively proven (1) that the defendant was warned of his constitutional rights, (2) that the defendant knowingly and intelligently waived such rights, and (3)

whether the statement was made voluntarily. Absent any one of these findings, you should disregard the statement completely and accord no evidential weight whatsoever to it or to any part of it.

As we have noted, the trial court adequately instructed the jury on the voluntariness of the confession in a context which included references to the advice given to Hampton as to his *Miranda* rights and to the requirement of proof of his understanding waiver of those rights. Plainly the jury's ultimate decision as to whether the confession was the product of defendant's own free will was to depend upon a consideration of all of the factors mentioned. They were specifically told that "before the [confession] can be considered as evidence by you you must *first* decide whether or not the State has shown that it was given voluntarily." Further, after mentioning that they would have the waiver with them, the court continued:

Now if you find that the State has failed to prove that the statement is voluntary, then you should disregard it completely and accord no evidential weight whatsoever to its contents. On the other hand, if you find that it was voluntarily made by the defendant, you may then consider it in the same manner as the other evidence and in so doing you must consider the credibility and weight to be given to the statement or confession in the light of all the evidence and circumstances of the case.

After reviewing the charge as a whole the Appellate Division found no prejudicial error. We agree with that result for two reasons: First, defendant did not testify in the main case before the jury. Thus, there was no contradiction of the testimony of the police officers, at whom the constitutional obligation to give the *Miranda* warnings is aimed, that they fulfilled that duty fully and completely. Nor was there any contradiction of their testimony and documentary proof bearing Hampton's signature showing a free will waiver of his right not to incriminate himself. Under these circumstances, to the extent that the charge permitted the jury to test voluntariness of the confession as if there were a factual dispute as to whether the *Miranda* rule had been

complied with, and whether defendant's rights thereunder had been waived, he was benefitted rather than prejudiced.

The second reason for sustaining the trial court's charge is one which has not been expressed thus far in the decisions of this Court.

Prior to May 1960 the rule in this State respecting confessions was that since they were not competent evidence unless voluntary, the issue of admissibility, *i. e.*, voluntariness, was for determination by the court alone. If upon a hearing on that issue in or out of the presence of the jury, during the trial of the indictment against the defendant, the trial court decided the confession was not voluntary, it was excluded as evidence. If, however, the court found that it was voluntary, it was admitted in evidence and the issue of voluntariness was not submitted to the jury. Their consideration was limited to a determination of the truth of the confession. In that connection, however, the jury was authorized to evaluate its credibility in light of any factual dispute or inherent improbability in the testimony on the subject of its voluntariness.

In *State v. Smith,* 32 *N. J.* 501, 557–560 (1960) (concurring opinion), *cert. den.* 364 *U. S.* 936, 81 S. Ct. 383, 5 *L. Ed.* 2d 367 (1961), the majority of this Court abandoned that rule, known as the "orthodox" rule, in favor of the so called "Massachusetts" rule. The latter doctrine required the trial court in the first instance to pass upon the issue of voluntariness of a confession, and to admit it in evidence only if found to be voluntary. However, such a finding was not to be disclosed to the jury. If the proof on which the court's finding was made was such that reasonable men might disagree as to voluntariness, that issue was to be submitted to the jury with instructions to disregard the confession if they found the State had not proved it to be voluntary. 32 *N. J.* at 559–560. This rule has been the law of our State since that time.

We did not adopt the Massachusetts rule as a matter of constitutional compulsion. The admissibility or competency

of evidence is traditionally for the court alone and the due process mandate of the Fourteenth Amendment requires only a judicial ruling on voluntariness of a confession before it can be admitted in evidence. No obligation is imposed thereby to have a jury as well as the court pass upon the issue. *Jackson v. Denno,* 378 *U. S.* 368, 84 S. Ct. 1774, 12 *L. Ed.* 2d 908 (1964); *Lego v. Twomey,* 404 *U. S.* 477, 92 S. Ct. 619, 30 *L. Ed.* 2d 618 (1972); *State v. Smith,* 32 *N. J.* at 545. We joined the jurisdictions which had espoused the minority Massachusetts rule because it seemed to us that justice might be more equitably served if both court and jury made original and independent findings as to the voluntariness of confessions. *Id.* 32 *N. J.* at 557, 559–560. Thereafter and prior to *Miranda v. Arizona,* 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed.* 2d 694 (1966), the dual method seemed to operate without any procedural difficulties.

With the advent of *Miranda,* procedural complications arose in the administration of the Massachusetts rule. As a matter of constitutional law *Miranda* bars from evidence confessions obtained by police in custodial interrogations unless before questioning begins the accused is advised (1) of his right to be silent, (2) that anything he says can be used against him in a court of law, (3) that he has the right to the presence of an attorney, (4) that if he cannot afford an attorney one will be appointed for him prior to any questioning, if he so desires, and (5) that he has the continuing opportunity to exercise these rights at any time during the questioning. It was said also that "[a]fter such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 384 *U. S.* at 479, 86 S. Ct. at 1630, 16 *L. Ed.* 2d at 726.

Obviously these new strictures were not foreseen when the *Smith* decision turned from the orthodox test for determining admissibility and voluntariness of confessions to the requirement for two decisions, first by the trial court and a second by the jury.

The new problem created by *Miranda* was this: When the United States Supreme Court said that *unless* and *until* the prosecution demonstrates that the warnings were given and the waiver made no evidence obtained as the result of interrogation can be used against the accused at trial, what effect was intended on the procedure established by the Massachusetts rule for determination of the issue of voluntariness of his confession and its admission in evidence? Some trial judges took the view that an additional essential step had been added to the procedure. It was their opinion that since advice as to the *Miranda* rights and proof of their waiver were constitutionally required, an *initial* decision had to be made as to whether such requirements were met, before the issue of voluntariness could be reached under either the Massachusetts or orthodox rule. And it was felt that regardless of which rule applied, if it was decided by the court alone or by the court first and then the jury, that *Miranda* had not been complied with the inquiry as to admissibility ended; the confession had to be excluded, and no further inquiry as to voluntariness could be engaged in. If, however, the determination was made that the *Miranda* mandates had been met, then and only then would the second step be proper, *i. e.*, consideration of voluntariness in the pre-*Miranda* sense. In this latter connection the obvious is noted — a confession given during in-custody interrogation may be involuntary in fact even if *Miranda* warnings have been given.

Other trial judges while conceding that the nature of the *Miranda* warnings is such that the issue as to whether they were given goes to the competency of evidence, *i. e.*, admissibility of the confession, suggest that the warnings and waiver are really an integral part of the overall problem of

voluntariness, and therefore where the Massachusetts rule is followed they are simply part of the whole factual complex to be submitted first to the court and then, if its decision on voluntariness is favorable, to the jury for similar resolution.

This court has not been called upon previously to decide whether an initial independent decision must be made that *Miranda* has been complied with before the pre-existing type of issue of voluntariness of a confession can be reached. Nor have we been asked previously to decide whether the rule adopted in *Smith* should be limited to the pre-*Miranda* type of case there presented and since the subsequent *Miranda* doctrine relates to competency of evidence in narrow constitutional terms, the orthodox rule should be applied calling for decision on that subject by the court alone. However, the Appellate Division in *State v. Ford,* 111 *N. J. Super.* 11, 13 (1970) obviously conscious that in our State the Massachusetts rule now applies, held that the trial court's "refusal to instruct the jury as to the warnings required under *Miranda* and that if they found the warnings were not given, to disregard the [defendant's] statement completely, was reversible error."[2]

■ In view of *Jackson v. Denno* and *Lego v. Twomey, supra,* there is no constituional obligation to submit to the jury for determination the issue of whether the *Miranda* warnings were given to a defendant and the rights described thereby waived by him before he confessed. Since the question involves the competency of evidence, decision thereon traditionally rests with the trial judge. Therefore, as we have already indicated, under ordinary circumstances if the pre-*Smith* doctrine still applied, a judge's ruling that *Miranda* had been complied with clearly would have been sufficient under *Jackson.* Further since *Smith* pre-dated *Miranda,* and did not foresee its implications, it is most

---

[2]Two other parts of the Appellate Division in unreported opinions have approved this holding. *State v. Hart,* A–1585–69 (1971); *State v. Arnold,* A–1959–69 (1971).

unlikely that if *Miranda* existed at the time of *Smith* we would have abandoned the orthodox rule. But, in any event so far as *admissibility* of a confession is concerned, adoption of *Smith* does not foreclose a separate and independent preliminary decision by trial courts as to whether the litany of rights had been explained to the defendant and whether he understandingly waived those rights. Nor does it stand in the way of a holding that the basic problem of voluntariness in fact should not be reached until the question whether *Miranda* was complied with has been answered. Assuming recognition of a requirement for these two court steps, the next problem, created by the Massachusetts rule, is whether the jury must also decide whether *Miranda* was followed, and if they find that the warnings were given and a waiver obtained, whether they should then proceed to the discharge of their traditional duty in this area, *i. e.*, a determination as to the credibility of defendant's confession. See also *United States v. Panepinto,* 430 *F.* 2d 613, 617–619 (3 Cir.), *cert. den. sub nom. Orangio v. United States,* 400 *U. S.* 949, 91 S. Ct. 258, 27 *L. Ed.* 2d 256 (1970).

In view of the difficulties created by *Miranda* in applying the Massachusetts doctrine in this State, it seems advisable to consider whether we should continue adherence to it or return to the orthodox rule of allocating responsibility between court and jury as to admissibility of confessions. A reasonable argument can be made for the proposition that because of its *per se* constitutional dimensions, a determination of the issue of admissibility under *Miranda* calls for a decision solely by the trial court as to whether the warnings were given and the rights waived. For example, in California where prior to *Miranda* independent determinations by court and jury had been required as to the voluntariness of incriminatory statements, it was said "[it] does not necessarily follow that a similar rule should obtain as to the rights to counsel and to remain silent before allowing jury consideration of an extrajudicial statement. The matters which must necessarily be placed before the jury

in such an instance are not of the same nature as those which are presented to a jury on the question of voluntariness. * * * Moreover, the determination which must be made is a more complex one than in the case of a question of voluntariness * * *." *People v. Sanchez,* 65 *Cal.* 2d 814, 56 *Cal. Rptr.* 648, 656–657, 423 *P.* 2d 800, 808–809 (1967), pet. for *cert.* dismissed, 394 *U. S.* 1025, 89 S. Ct. 1646, 23 *L. Ed.* 2d 743 (1968), reversed on other grounds, 70 *Cal.* 2d 562, 75 *Cal. Rptr.* 642, 451 *P.* 2d 74 (1969).

The Federal Court of Appeals for the 10th Circuit in *Coyote v. United States,* 380 *F.* 2d 305, *cert.* denied 389 *U. S.* 992, 88 S. Ct. 489, 19 *L. Ed.* 2d 484 (1967), took the same view:

In determining admissibility in the first instance the judge is undoubtedly bound by the dictates of *Miranda, i. e.* if its prerequisites have not been fully met, the confession is without more involuntary as a matter of law, hence inadmissible and insubmissible. But an incriminating statement may also be inadmissible and insubmissible because not factually shown to have been freely and voluntarily given, even though the requirements of *Miranda* have been fully met; for an accused may surely be physically or psychologically induced to incriminate himself after he has been fully warned and advised of all his Constitutional rights. If the statement is admitted, the jury must, as we have seen, first determine for themselves whether the statement was in fact freely and voluntarily given. If not, they must wholly disregard it. Indeed they were so instructed in this case.

On the issue whether the admitted statement is voluntary in fact, it is undoubtedly competent to show, as in the admissibility hearing, not only that while the accused was under in-custody interrogation he was, for example, denied food, drink and sleep, or promised leniency, but also that he was not forewarned and advised of his rights as explicated in *Miranda.* In short, compliance with *Miranda* may very well be relevant to the factual issue of voluntariness; but, it is not prerequisite. *Miranda* is concerned with voluntariness in terms of admissibility — it does not undertake to prescribe the prerequisites to a jury finding of factual voluntariness.

A jury is, of course, entitled to the guiding hand of the judge in the application of the law to the facts as they find them. And, in a proper case the jury should surely be told that if they find defendant did not fully understand the meaning of the warning and advice given to him as stated in a confession, they may take that fact into consideration along with all the other facts and circumstances in determining the factual voluntariness of the statement. 380 *F.* 2d at 309–310.

Upon consideration of all aspects of the problem, we are of the opinion that a return to the orthodox rule would simplify the procedure and best serve the cause of justice. Such a return would restore the traditional roles of judge and jury in criminal trials, *i. e.,* the judge would decide competency in the sense of satisfaction of *Miranda* requirements and the Fifth Amendment demand for voluntariness of the confession, while the jury after evaluating all the factual proof would decide its credibility.

This view brings to the fore the question whether Rule 8(3) of the Rules of Evidence may be interpreted fairly to permit return to the pre-*Smith* rule. That rule which became effective September 11, 1967, *N. J. S. A.* 2A:84A-1 *et seq.,* 2A:84A-36 provides:

> In the case of a statement against the penal interest of the defendant on trial in a criminal proceeding, the judge, if requested, shall hear and determine the question of its admissibility out of the presence and hearing of the jury. In such a hearing the rules of evidence shall apply and the burden of proof as to admissibility of the statement is on the prosecution. If the judge admits the statement he shall not inform the jury that he has made a finding that the statement is admissible, and he shall instruct the jury that they are to disregard the statement if they find that it is inadmissible under the rules of law pertaining to such statements * * *.

Manifestly the rule does not explicitly control the question before us. "Admissibility" can have diverse connotations in the law depending upon the context in which the need to define arises. Admissibility of a confession at a jury trial prior to *Smith* was a question of competency of evidence, which in such a context meant voluntariness — a question of law for the court alone. And pre-*Smith,* a finding by the jury that the confession was unworthy of belief, would mean that for purposes of discharge of their role in the trial process, it was "inadmissible," *i. e.,* could not be used against the defendant and "under the rules of law pertaining to such statements" they would be required to disregard it. It may be conceded that the comment appearing under

the rule (which was not part of the rule and was not adopted as "the expression of [this Court's] ultimate views." *New Jersey Rules of Evidence,* 1972 Ed., v.), suggests a construction which, because of the *Smith* decision, would treat the term "inadmissible" as authorizing a jury finding as to voluntariness as well as credibility of the confession. (1972 Ed., *supra,* (Comment) at 24–25).

However, the Legislature in its wisdom approved and adopted Rule 5 which says:

> The adoption of these rules shall not bar the growth and development of the law of evidence in accordance with fundamental principles to the end that the truth may be fairly ascertained.

This was done because both the lawmakers and the court recognized that the development of the law of evidence is an ongoing process, and that cases would arise dealing with situations not foreseen specifically which would require that the formal rules be construed and interpreted in the same manner as statutes are treated. 1972 *Ed. supra,* at xxiii. Consequently the necessity arises to consider whether in light of the additional problems respecting the admissibility of confessions raised by *Miranda,* Rule 8(3) can be reasonably interpreted to permit a return to the pre-*Smith* orthodox rule. We believe it can be and that in justice it should be so interpreted.

 Admissibility of evidence is for the court and in the ordinary course of trial it is admitted when a proper predicate is laid for it. If the predicate is disputed but the court is satisfied the evidence should be received, it is accepted for jury consideration, with an instruction that if they find it credible, then it is admissible for consideration in making up their verdict. Thus, although certainly not a desirable method of expression, it would not be legally incorrect for the judge to charge the jury that if after consideration of all the facts they did not believe the confession, it would be "inadmissible" for their purposes and they

should disregard it. *Cf. Carbough v. State,* 49 *Tex. Cr. R.* 452, 93 *S. W.* 738 (1906). However, in applying Rule 8(3) hereafter with respect to consideration of confessions by the jury, the term "inadmissible" should be given the more appropriate context connotation, *i. e.,* "not credible." Rule 8(3) would then be read consistently with renewed recognition of the orthodox rule respecting admissibility of confessions. Accordingly, and although we find no error in the manner of the trial court's submission of the confession issue in this case, we hold for the future that the trial court alone shall determine (1) whether the *Miranda* warnings were given to the accused and his rights thereunder waived by him before the confession was given; and that if it finds the warnings were not given, or if given the rights not waived, the confession must be excluded, and (2) if those conditions were satisfied, whether in light of all the circumstances attending the confession it was given voluntarily. If these questions are resolved in favor of the State, then, without being advised of the court's decision, the jury shall be instructed that they should decide whether in view of all the same circumstances the defendant's confession is true. If they find that it is not true, then they must treat it as inadmissible and disregard it for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence.

## II.

This brings us to a consideration of defendant's contentions that the facts of this criminal event did not warrant either indictment or conviction for kidnapping, *N. J. S. A.* 2A:118–1, and that in any event the statute and the punishment provided for its violation are invalid constitutionally.

The statute says that:

Any person who kidnaps or steals or forcibly takes away a man, woman or child, and sends or carries * * * such man, woman or

child to any other point within this state * * *, is guilty of a high misdemeanor, and shall be punished by imprisonment for life, or for such other term of not less than 30 years as the court deems proper.

The historical evolution of this statute is set forth in *State v. Johnson*, 67 *N. J. Super.* 414 (App. Div. 1961), and *State v. Gibbs*, 79 *N. J. Super.* 315 (App. Div. 1963), and need not be repeated here. Since 1796 the Legislature has shown an increasing concern about the seriousness of kidnapping and an intent to make the description of the offense and the punishment therefor more relevant to the conditions of the times and the need for deterrence. The common law prerequisite for proof of asportation of the victim from one country to another to establish the crime, was changed in the original New Jersey statute to a requirement for transportation of the victim "from this state into another state or country." *Paterson Laws of New Jersey*, 218 (1800) ; *State v. Johnson*, 67 *N. J. Super.* at 420. Ultimately the asportation element took on its present form, *i. e.*, the forcible taking of the victim from one place to "any other point within the state."

Moreover, the sentence fixed for the offense took an ascending severity from a maximum imprisonment of five years to the present mandate for life imprisonment or for "such other term of not less than 30 years as the court deems proper." *Id.* at 420–422.

The power to declare what shall be deemed a crime and to fix the maximum and minimum term of imprisonment for such a crime is committed by the people of the State to the legislative and not to the judicial branch of government. The fact that the lawmakers provide more severe punishment for an offense than the courts approve is no ground for judicial interference, unless it violates a constitutional or other prohibition against such punishment. In dealing with the question courts consider whether the nature of the criticized punishment is such as to shock the general conscience and to violate principles of fundamental fairness; whether comparison shows the punish-

ment to be grossly disproportionate to the offense, and whether the punishment goes beyond what is necessary to accomplish any legitimate penal aim. Absent such a showing the judiciary must respect the legislative will. *State v. Smith*, 58 *N. J.* 202, 211 (1971); *State v. Griffin*, 84 *N. J. L.* 429, 432 (Sup. Ct. 1913), aff'd 85 *N. J. L.* 613 (E. & A. 1914); *Ex parte Zee*, 13 *N. J. Super.* 312, 320–322 (Law Div.), aff'd P. C. *State v. Zee*, 16 *N. J. Super.* 171 (App. Div. 1951), cert. den. 343 *U. S.* 931, 72 S Ct. 766, 96 *L. Ed.* 1340 (1952); Comment Note: *Cruel Punishment—Length of Sentence*, 33 *A. L. R.* 3d 343, 352 (1970).

▮ Defendant claims also that the statute is unconstitutional on its face because conviction exposes a defendant to a minimum sentence of 30 years in prison and a maximum of life imprisonment which constitutes cruel and unusual punishment. We cannot agree. Nor do we see any merit in the argument that such possible punishment is arbitrary and constitutes a denial of due process and equal protection because some crimes which defendant suggests are as serious offenses against society as kidnapping do not carry as severe punishment. No case has been cited which reasonably supports such a position. On the contrary see, *State v. Cox*, 101 *N. J. Super.* 470 (App. Div. 1968); certification denied 53 *N. J.* 510 (1969); *State v. Gibbs, supra; State v. Johnson, supra; Smith v. United States*, 407 *F.* 2d 356, 359 (8 Cir.), cert. den., 395 *U. S.* 966, 89 S. Ct. 2113, 23 *L. Ed.* 2d 753 (1969); *Hess v. United States*, 254 *F.* 2d 578, 588 (8 Cir. 1958); *State v. Howland*, 103 *Ariz.* 250, 439 *P.* 2d 821 (1968), overruled in part on other grounds, *State v. Burchett*, 107 *Ariz.* 185, 484 *P.* 2d 181 (1971); *Cox v. State*, 203 *Ind.* 544, 177 *N. E.* 898, 181 *N. E.* 469 (1932); *State v. Bruce*, 268 *N. C.* 174, 150 *S. E.* 2d 216 (1966).

Defendant urges that his conduct constituted a unitary criminal event, that the alleged kidnapping was a subsidiary incident of the breaking and entering offense, and that the asportation of Mrs. Rayborn was for the purpose of completing that offense, *i. e.*, to accomplish his escape. He claims

that double jeopardy principles are violated when the basic crime intended to be committed is broken down by the State into constituent elements of the single event and a separate conviction is sought for each element in order to aggravate the punishment.

It is true that in a given case an asportation of the victim of the defendant's first crime in a sequence of events may be so incidental and so minimal as not to permit fractionation. Compare *People v. Williams*, 2 *Cal.* 3d 894, 88 *Cal. Rptr.* 208, 471 *P.* 2d 1008 (1970), *cert.* den., 401 *U. S.* 919, 91 S. Ct. 903, 27 *L. Ed.* 2d 821 (1971); *People v. Daniels*, 71 *Cal.* 2d 1119, 80 *Cal. Rptr.* 897, 459 *P.* 2d 225 (1969); *People v. Lombardi*, 20 *N. Y.* 2d 266, 282 *N. Y. S.* 2d 519, 229 *N. E.* 2d 206 (1967); *People v. Levy*, 15 *N. Y.* 2d 159, 256 *N. Y. S.* 2d 793, 204 *N. E.* 2d 842, *cert.* den., 381 *U. S.* 938, 85 S. Ct. 1770, 14 *L. Ed.* 2d 701 (1965). See generally *Annot.* 43 *A. L. R.* 3d 699 (1972). Ordinarily the decision as to whether the asportation of a victim is sufficient to indicate commission of the separate and distinct crime of kidnapping in addition to the basic crime undertaken by a defendant to warrant prosecution as such, rests with the discretion of the prosecutor in the first instance. As Judge Gaulkin said in *State v. Johnson, supra,* the severe penalty commanded by the statute for kidnapping imposes upon the prosecutor a moral obligation not to seek an indictment therefor unless the crime fairly appears and warrants the heavy punishment. 67 *N. J. Super.* at 422, 423. We add also that both trial and appellate courts have the obligation of reviewing the facts carefully in order to determine if the separate offense of kidnapping was sufficiently shown.

In the present case we are satisfied that the conviction for kidnapping was justified. Defendant's act in forcing Mrs. Rayborn to leave her apartment at gun point and to drive him in her car about the countryside at night for about an hour, frequently threatening her with being shot, and in fact causing her to believe he intended to shoot her

to the point where in her fright she did risk death to get out of the car, was not an integral part of the commission of the single crime of breaking and entering. The forcible detention could reasonably be considered a separate event deliberately undertaken and warranting separate prosecution. The asportation and detention were not incidental to the underlying crime, and they substantially increased the risk of harm to the victim beyond that normally inherent in breaking and entering. Under the circumstances, the jury was justified in finding guilt of the separate crime of kidnapping. *State v. Ginardi*, 111 *N. J. Super*. 435, 438–441 (App. Div. 1970), aff'd *o. b.*, 57 *N. J.* 438 (1971) ; *State v. Cox, supra; State v. Gibbs, supra; State v. Johnson, supra.*

The trial court sentenced Hampton to 30 to 35 years in State Prison, which defendant attacked generally on the ground that the statutory penalty was unconstitutionally severe. The Appellate Division felt that the sentence should be a 30 year term, the minimum under the kidnapping statute, and on its own motion reduced it to that term without any specification as to minimum or maximum. In our judgment this was incorrect and requires some corrective action.

The statute prescribes that the person convicted "shall be punished by imprisonment for life, or for such other term of not less than 30 years as the court deems proper." *N. J. S. A.* 2A:118–1. Service of that kind of a sentence means confinement in State Prison where all sentences are required to "be for a maximum and minimum term, except sentences for life." *N. J. S. A.* 2A:164–17; *State v. Fisher*, 115 *N. J. Super*. 373, 378–379 (App. Div. 1971) ; *State v. Janiec*, 25 *N. J. Super*. 197 (App. Div. 1953) ; *State v. Moore*, 21 *N. J. Super*. 419 (App. Div. 1952). *Cf. State v. Roleson*, 14 *N. J.* 403, *cert.* den. 347 *U. S.* 947, 74 S. Ct. 647, 98 *L. Ed.* 1095 (1954) ; *Annot.* 29 *A. L. R.* 2d 1344 (1953), and later case service.

In light of *N. J. S. A.* 2A:164–17, the penalty specified under the kidnapping act for less than life imprisonment rea-

sonably means a sentence of a minimum of 30 years and a maximum term of years fixed by the court short of life. For example, a sentence, as in this case, of a minimum of 30 years and a maximum of a fixed term above 30 years appears to be entirely within the legislative scheme. In addition, it is compatible with and becomes subject to the Parole Act, *N. J. S. A.* 30:4–123.10 which would give parole eligibility upon service of the minimum sentence or one-third of the fixed maximum sentence.

The sentence as altered by the Appellate Division being invalid, the problem of rectification confronts us. We see no need for a remand to the Appellate Division for that purpose as in our view the correction may be made here. Accordingly, the defendant's sentence is revised so as to impose a term of a minimum of 30 and a maximum of 31 years. See, *R.* 2:10–3; and compare *State v. Ward,* 57 *N. J.* 75 (1970) ; *State v. Culver,* 23 *N. J.* 495, *cert.* den., 354 *U. S.* 925, 77 S. Ct. 1387, 1 *L. Ed.* 2d 1441 (1957), *Culver v. Goodman,* 359 *U. S.* 975, 79 S. Ct. 884, 3 *L. Ed.* 2d 842 (1959) ; *State v. Fisher, supra; State v. Andrews,* 105 *N. J. Super.* 62 (App. Div. 1969), rev'd on other grounds *sub nom State v. Horne,* 56 *N. J.* 372 (1970) ; *State v. Thompson,* 84 *N. J. Super.* 173 (App. Div. 1964).

## III.

For the reasons expressed the judgment of the Appellate Division is affirmed as modified, and the cause is remanded to the trial court for entry of the corrected sentence.

WEINTRAUB, C. J., dissenting in part. I join in the opinion of the Court except with respect to its treatment of the 30-year provision in *N. J. S. A.* 2A:118–1. The statute provides that any person committing the kidnapping offense therein described "is guilty of a high misdemeanor, and shall be punished by imprisonment for life, or for such other term of not less than 30 years as the court deems proper." The

Court's opinion reads the statute to mandate a "minimum" term of 30 years. I read the statute to authorize a "maximum" term of not less than 30 years in lieu of the maximum of life imprisonment, the minimum to be such term as the sentencing judge may select.

I agree with the Court's opinion that a State Prison sentence is required by *N. J. S. A.* 2A:164–17 to "be for a maximum and minimum term, except sentences for life," the minimum term to be not less than one year. But the question is whether the quoted portion of *N. J. S. A.* 2A:118–1 refers to the minimum term or to the maximum when it speaks of "such other term of not less than 30 years as the court deems proper." I think the reference is to the maximum term, for several reasons.

The authority thus given the sentencing judge qualifies "imprisonment for life," which is itself a maximum and not a minimum term,[1] thus indicating the Legislature had the maximum in mind. The Legislature invested the sentencing judge with a choice as is evident from the use of the conjunction "or." The choice must be of things of like functional quality—here of maximum sentences. It would make no sense in our penal scheme to ask a sentencing judge to choose between a maximum sentence and a minimum sentence.

Indeed, if the Legislature intended a minimum term of 30 years, there would be no authority for any maximum term if the minimum is imposed.[2] Surely the 30-year provision

---

[1] Life imprisonment is usually authorized without a provision for a minimum term, but conceptually it is a maximum term.

[2] If the 30-year provision related to the minimum, then the Appellate Division in this case would have been correct in impositing a 30-year minimum term without any maximum. Apparently the Appellate Division read *State v. Johnson*, 67 *N. J. Super.* 414, 434 (App. Div. 1961), to call for the imposition of only a "minimum" term. In fact the term there imposed was 30 years to 35 years, and it is not clear that *Johnson*, in using the word "minimum" was speaking of a "minimum" and not of a "maximum" of not less than 30 years.

cannot itself serve to authorize both a minimum of 30 years and a maximum of whatever number of years a judge may select. If a statute provided only that a person guilty of an offense "shall be punished by imprisonment for not less than two years," it would hardly be maintained that the sentencing judge could add a maximum of any duration he might choose (other than of course a maximum authorized by a general statute fixing the punishment for that class of misdemeanor). Nor can the provision for imprisonment for life serve itself as the maximum or as authority to impose a maximum in terms of years. This is so because a choice is mandated between life imprisonment and imprisonment for not less than 30 years, and both terms could not be imposed simultaneously unless the conjunction "or" were read to mean "and," and if "or" were read to mean "and," then a life sentence coupled with a 30-year minimum would be mandatory in every case.[3]

In finding authority for both a minimum term of 30 years and a maximum term of a greater number of years, the majority apply the statute as if it read that a person convicted of the offense shall be punished "by imprisonment for life, or by imprisonment for not less than 30 years and not more than life or such term of years as the court deems proper." That of course is not what the draftsman said.

To put it in other words, the phrase "such other term," taken in isolation, could refer either to a "maximum" or to a "minimum" term. One word or the other must be interpolated in reading the phrase. The majority interpolate "minimum" so that the phrase becomes "such other (minimum) term." But the phrase can be read as "such other (maximum) term." That reading, I believe, is the only one

---

[3]A sentence of 30 years to life was sustained in *State v. Rosenberg*, 30 *N. J. Super.* 369 (App. Div. 1954), apparently on the thesis that the statute *requires* a life sentence to be imposed but permits imposition also of a minimum of not less than 30 years. There was no discussion as to whether that minimum advantages or disadvantages the recipient of the life sentence. I cannot agree with that reading of the statute.

which gives meaning to the words "such other" in the total context. A draftsman would hardly say "and shall be punished by imprisonment for life, or such *other minimum* term of not less than 30 years as the court deems proper." But it would be sensible and correct to say "and shall be punished by imprisonment for life, or for such *other maximum* term of not less than 30 years as the court deems proper." If one wanted to express the reasonable thought that the maximum for a crime should be life but that there should be discretion to impose a lesser maximum, not below 30 years, he would say precisely what the Legislature said here, that the defendant "shall be punished by imprisonment for life, or for such other term of not less than 30 years as the court deems proper." That, I believe, is precisely what the Legislature intended.

That this is the correct reading becomes evident when reference is made to the subject of release from imprisonment. A mandatory minimum of 30 years would not serve any apparent purpose. I think it evident that the Legislature intended to permit a more lenient term by the clause in question. Under *N. J. S. A.* 30:4–123.11 a person under a life sentence is eligible for release on parole "after having served twenty-five years of his sentence, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments," which can make him eligible in about 14 years. A 30-year "minimum" would not hasten parole eligibility. Hence if a life sentence were imposed as the maximum (assuming the statute permits a sentence of 30 years to life, see *State v. Rosenberg, supra,* 30 *N. J. Super.* 369), eligibility for parole would be governed by *N. J. S. A.* 30:4–123.11, just cited, and that section provides no role for a minimum when the sentence is for life.

And if the maximum imposed is a term of years rather than life, a minimum of 30 years again would have no role

as to parole eligibility, and this because of two statutory provisions. *N. J. S. A.* 30:4–123.10 provides, as to a first offender, that:

No inmate of a penal or correctional institution serving a sentence for a fixed minimum and maximum term shall be eligible for consideration for release on parole until he has served his minimum sentence or 1/3 of his fixed maximum sentence, less, in each instance, commutation time therefrom for good behavior and for diligent application to work assignments whichever occurs sooner, subject to the provisions of section 12 hereof.

(Section 12 provides as to second, or further, offenders, that eligibility for parole shall be determined on the basis of a higher percentage of the maximum sentence imposed. *N. J. S. A.* 30:4–123.12.) Thus if a minimum of 30 years were imposed, parole eligibility would not be hastened under the statutory provision just quoted unless the maximum exceeded 90 years and the crime was the offender's first offense. *State v. Cooper,* 54 *N. J.* 330, 335–336 (1969). And even if the maximum were of that extraordinary duration, the last paragraph of the same statute would take over, for it provides that:

"* * * whenever it shall appear that the date upon which a prisoner shall be eligible for consideration for release on parole occurs later than the date upon which he would be so eligible if a life sentence had been imposed upon him, then, and in such case, he shall be deemed eligible for consideration for release on parole after having served 25 years of his sentence, or sentences, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments."

Thus a mandatory minimum of 30 years has no impact upon parole eligibility. And of course it would have no impact upon a final discharge from custody since completion of a sentence is determined by the maximum rather than the minimum. Hence I find no role for a mandatory minimum of 30 years under our statutory parole scheme. A

role could be found only if it were held that the Legislature intended to override that parole scheme, and no one advances that view.

On the other hand, the mandatory 30-year term has meaning if it refers to the maximum, for it would permit consideration for parole at an earlier date than in the case of a life sentence. Thus read, the provision is in harmony with the general legislative practice of prescribing only the "maximum" sentence, leaving the minimum to the discretion of the sentencing judge. See *N. J. S. A.* 2A:85–6, as to high misdemeanors, and *N. J. S. A.* 2A:85–7, as to misdemeanors. Thus *N. J. S. A.* 2A:118–2, which deals with a threat or attempt to kidnap, authorizes "imprisonment for a term of not more than 30 years," or a fine, or both, the Legislature thereby specifying the maximum and leaving the minimum to the sentencing judge. Although as to some offenses the Legislature has prescribed a mandatory minimum, I am not aware of any instance in which the Legislature did so without also specifying the authorized maximum. Upon the majority's reading of the statute before us, there would be a mandatory minimum without an express specification of a maximum term of years. It is more consonant with legislative style to say the mandated 30-year term applies to the maximum, the sentencing judge being free to fix the minimum he finds appropriate.

For these reasons I conclude that the 30-year mandate limits the underside of the maximum rather than the minimum. But of course a trial judge may impose a maximum in excess of 30 years. Accordingly there was no legal infirmity in the trial court's sentence of 30 to 35 years. I cannot say the trial court fixed the maximum at 35 years or the minimum at more than 1/3 of that maximum because he read the statute to prescribe a mandatory minimum. If this assumption is incorrect, the trial court would be free to reconsider the sentence under my view of the statute.

Weintraub, C. J., concurs in result and dissents in part.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For reversal*—None.