# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3301-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

R.B.L.,

    Defendant-Appellant.

_____

> Argued November 1, 2021 – Decided December 29, 2021
>
> Before Judges Sumners and Firko.
>
> On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 16-11-2191.
>
> Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).
>
> Dina R. Khajezadeh, Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; Dina R. Khajezadeh, on the brief).

PER CURIAM

Tried by a jury, defendant R.B.L.[1] was found guilty of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). The offenses were committed against his stepdaughter, O.E. (Odele). Prior to sentencing, the trial court denied defendant's motion for a new trial. After merger of the two convictions, he was sentenced to six years in prison and supervised parole for life.

Defendant challenges his convictions arguing:

> POINT I
>
> THE TRIAL COURT ERRED IN CONCLUDING THAT DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS RIGHT TO REMAIN SILENT AND TO COUNSEL.
>
> POINT II
>
> THE TRIAL COURT ERRED IN FAILING TO PROVIDE GUIDANCE TO THE JURY AS TO HOW TO EVALUATE THE CREDIBILITY OF DEFENDANT'S RECORDED STATEMENT. (NOT RAISED BELOW).

---

[1] We use initials and pseudonyms to protect the privacy and preserve the confidentiality of the victims and this proceeding. N.J.S.A. 2A:82-46(a); R. 1:38-3(c)(9).

A-3301-18

POINT III

THE FRESH COMPLAINT TESTIMONY WAS IMPERMISSIBLY DETAILED, AND THE PROSECUTOR IMPROPERLY ARGUED THAT THE FRESH COMPLAINT CORROBORATED THE TRUTH OF THE COMPLAINING WITNESS'S ALLEGATIONS. (NOT RAISED BELOW).

We affirm because we conclude there were no errors by the trial court or improper arguments by the prosecution.

## I.

Addressing defendant's arguments in the order presented, he initially contends the trial court erred in finding that he waived his Miranda[2] rights when he gave statements to police detectives during two separate interviews and allowed the statements to be admitted into evidence. We disagree.

## A.

In a Miranda hearing, the court addressed defendant's motion to suppress his statements to police on June 17 and 28, 2016. Jackson Township Police Detective John Rodriguez testified that on June 14, he and Ocean County Prosecutor's Office Detective Thomas Tiernan were assigned to investigate

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Odele's sexual abuse allegations against defendant. On June 16, Odele and her mother, T.B. (Terri), went to the Jackson Township police station after being contacted by Rodriguez regarding allegations that defendant engaged in unwanted sexual contact with Odele. Terri and defendant were married at the time, but they were separated, with defendant living elsewhere. During the interview, Terri stated that he would be at her house the next morning to retrieve some tools. Rodriguez and Tiernan replied that they would be there to meet with him.

The next morning, June 16, the detectives were at Terri's house when defendant appeared with K.H. (Kim). Rodriguez testified that prior to speaking with defendant, he heard defendant and Kim conversing in English. The detectives introduced themselves to defendant and informed him that Terri "was disputing his ownership of the tools that he had come to retrieve. So [they] asked if he would come back to the Jackson Township Police Department for an interview."[3] He voluntarily agreed to come to the police station, "but requested

---

[3] In his merits brief, defendant contends Rodriguez stated he and Tiernan wanted to speak with defendant about a "civil matter" pertaining to the disputed tools. However, the record does not indicate the term "civil matter" was used by defendant when referencing the disputed tools. Rather, Rodriguez "basically told him" it was a civil matter when cross-examined by defense counsel.

that [the police] provide transportation for him [because] he didn't want to inconvenience [Kim]."  Rodriguez radioed a squad car to pick him up. Throughout the interaction, defendant was not under arrest.

When defendant arrived at the police station and entered the interview room, he was informed the session would be video recorded.[4]  Rodriguez then "confirmed . . . defendant's . . . name, date of birth . . . and [verified] that [he] live[d] in Sparta [alone] . . . or lived in Sparta with [Kim]."  Rodriguez also confirmed defendant was a forty-six-year-old native of Argentina and had lived in the United States for fifteen years.  He asked defendant "if he had any issues understanding the English language," to which he replied:  "Sometimes."[5] Rodriguez advised him that if he had any issues understanding English during the detective's reading of the Miranda waiver or during the interview, he should stop the interview.  Defendant said he understood.

Rodriguez then proceeded to read the Miranda waiver form, line-by-line, to defendant, during which the following exchange occurred:

---

[4] A DVD of both of defendant's statements was played during the Miranda hearing.

[5] Rodriguez testified he speaks "a functional level of Spanish" because of spending "years in the household and with family members [who speak Spanish] since [he] was a child."

[]Rodriguez:  "Anything you're saying will be used against you in a court of law."  Do you understand?

[Defendant]:  What do you mean, in the court of law, in a court of law?

[]Rodriguez:  In court.

[Defendant]:  In court?

[]Rodriguez:  In court.  Yes.

[Defendant]:  Okay.  No, I don't — I don't — I don't know why.

[]Tiernan:  What do you mean?

[Defendant]:  I don't understand why?

[]Tiernan:  It means that —

[Defendant]:  Yeah.  I — I —

[]Tiernan:  Do you understand what that — what it means?

[Defendant]:  Yeah.  Yeah.

[]Tiernan:  Okay.  All right.  Good.

[] Rodriguez:  It means we're going to talk about some things that, you know, that are important that, you know, —

[Defendant]:  Okay.  I understand, but I don't.

[]Tiernan:  But you understand what that line means?

A-3301-18

[Defendant]: Yeah. Yeah. I know —

[]Tiernan: That's all that we would like.

[]Rodriguez: Right. Right. Right. Anything we say here is on the record.

[Defendant]: On the record. I see.

[]Tiernan: Yes.

[Defendant]: Okay.[6]

After Rodriguez informed defendant that "[he] ha[d] the right to consult with an attorney at any time and have him present before and during questioning," he said he understood. The questioning continued:

[]Rodriguez: Okay. "If you cannot afford an attorney, one will be provided if you so desire prior to any questioning." Do you understand?

[Defendant]: What['s] happening, I can go to — I can get the lawyer.

[]Rodriguez: You can . . . absolutely get a lawyer.

[Defendant]: I don't want to go to the lawyer. . . .

[]Rodriguez: No, I understand.

[Defendant]: I'm the type of . . . .

---

[6] Later during the hearing, Rodriguez testified defendant "didn't understand the phrase [']court of law.[']" Rodriguez continued, stating once he explained to defendant that court of law meant "in court," defendant "restated . . . in affirmative tones that he understood [what "court of law" meant]."

A-3301-18

[]Tiernan:  You don't want to go to a lawyer?

[Defendant]:  No.  I don't — I don't like the problem.

[]Tiernan:  Right.  Right.

[]Rodriguez:  I don't think you have anything to hide.

[]Tiernan:  Right.

[Defendant]:  Exactly.

Rodriguez continued Mirandizing defendant by confirming his understanding that his "'decision to waive these rights [was] not final and he may withdraw [his] waiver whenever [he] wish[ed], either before or during questioning'  So[,] what that mean[t] [was] [defendant] [could] stop any time."  Defendant confirmed he understood.

Rodriguez then asked defendant to read the statement on the waiver form, acknowledging that he had been advised of his <u>Miranda</u> rights.  He instead asked Rodriguez to read the statement to him because he was "stressed."  Rodriguez read the statement and asked if he "understood everything that [was] read?"  He replied, "Yeah.  Yeah.  Uh hum."  To ensure he understood the rights read to him, Rodriguez reiterated his question by asking, "[n]o issues, right?" to which he repeated, "[n]o issues."  Defendant then signed the waiver.

A-3301-18

During the interview, defendant mentioned Terri kicking him out of her house on March 31, 2016, after they argued about him returning home at 2:30 a.m. He also explained that he was upset with Odele because her boyfriend, B.G. (Bert), was in her bedroom when he returned home one night.

The interview then transitioned to Odele's report of sexual abuse. Defendant described what he considered the "scratch and touch and play" game he played with her. During weekdays and weekends, he would go into Odele's room to turn off the television and Odele would ask him to scratch her back. On one occasion, Odele asked him to "scratch [her] ass," which he did over her clothing. This continued "[o]nce a week [for] a month [or] two months, that's it." He also touched her chest, legs, and back over her clothing for approximately five minutes until she was close to falling asleep. According to defendant, Odele never asked him to stop. She would also lift her shirt to have him "scratch her whole entire back" and chest on the side "sometimes in a chair, sometimes in the sitting room[.]"

Defendant also scratched Odele's buttocks nearly "all the way down" under the waistband of her pajama pants but over her underwear. He began "rubbing" Odele between 2014 and 2015. During one of his games, he accidentally touched her vagina in the living room when he picked her up and

9

put her on the couch. When Terri confronted him about touching Odele, he apologized to them.

The interview was conducted entirely in English, with which defendant acknowledged he was comfortable. At the interview's conclusion of the, he was allowed to leave.

The next day, Terri called Rodriguez telling him "that she had located some items of importance in [defendant's] van." She found "a cut[-]up picture of [Odele] and a handwritten note in Spanish . . . believed [to be] written by [] defendant."

On June 21, Rodriguez returned to Terri's home to retrieve the items she found in the van. He was given a notebook with defendant's writings and photographs inside of an envelope. He contacted defendant to return to the police station for a second interview that day, but defendant requested instead to be interviewed on June 28.

On June 28, Kim drove defendant to the police station. Joined by Jackson Township Police Detective Dominick Manion, Rodriguez informed him that he couldn't speak with him until he was Mirandized. Once in the interview room, Rodriguez advised him of his rights, reading the Miranda waiver form as he did

in the June 17 interview. He confirmed his understanding of each line read to him, replying "[y]es" and "[u]h hum," and signed the waiver form.

During the video-recorded interview, Rodriguez recounted what defendant stated in the June 17 interview about his conduct with Odele. Defendant agreed his actions were inappropriate, "[w]eird," and wrong. Rodriguez then discussed the notebook and the photographs found in the van. He admitted writing the letter in the notebook about Odele and possessing the cut-up photographs. He also admitted harboring inappropriate feelings for her, and her "fighting . . . and pushing [him] off" when he would enter her room at 1:30 a.m. to touch and rub her.

After reserving decision, the trial court issued an order denying defendant's motion to suppress his June 17 and June 28 statements to the police. In its bench opinion, the court determined Rodriguez's testimony "to be credible and corroborative of what was contained on [the recorded interview]." Using the totality of the circumstances, the court noted Rodriguez testified "that defendant was communicating with [the detectives] in English and was also communicating with [Kim] in English as well." The court found that while defendant was from Argentina, he had been in the United States for fifteen years, and that "several of his close family members in Argentina had been police

11

officers[,] including his father and brother." Regarding defendant's <u>Miranda</u> waiver, the court determined defendant voluntarily met with the detectives both on June 17 and June 28.

The court pointed out that prior to both interviews, defendant acknowledged he had no trouble understanding English, was aware he could stop the interview if he did not understand something, was told that anything he said could be used in court, that he could stop the interview after it started, and he had a right to attorney. He initialed and signed the waiver form demonstrating he understood his <u>Miranda</u> rights and waived them.

The court further explained:

> [D]efendant was awake and alert throughout the entire statement. He was animated, his responses to the detectives' questions were immediate and[,] in many cases[,] would seem[] almost forceful. He often used expressive physical movements as part of his verbal responses to emphasize his points. He was out of his chair for a significant portion of the statement in order to emphasize points or recreate the situations of concern to him and his home.
>
> At one point during the statement[,] he actually walked out of the room, knocked[,] and . . . re-entered to emphasize a point about a story he was telling and this was . . . all accompanied a communication, a verbal discourse by the . . . defendant. [D]efendant wasn't just playing charades. [D]efendant did not hesitate with his responses to questions and only asked for clarifications as to one or two points during questioning.

12

As to the purported language barrier, the court reasoned defendant "showed a command of the English language by using higher level words in their appropriate context" such as speaking about "doing things out of 'reaction' . . . defendant advis[ing] that his wife was 'intimidating him' by threatening to call the police," among other examples. The court maintained his responses "were not punctuated by pauses or searching for words, his responses were immediate and in context."

Moving to defendant's June 28 statement, the court held that, like his June 17 statement, he understood his <u>Miranda</u> rights and voluntarily waived them. Specifically, it found

> [defendant stayed] in [the] presumably English speaking home of [Kim] for [eleven] days [between June 17 and June 28] and []Rodriguez reached out to . . . defendant and asked whether he would speak to [the detectives] in the follow[-]up [interview] and apparently . . . defendant[,] knowing the nature of the investigation at that point in time and the basi[s] of the allegations against him, basically made an appointment with the detectives and returned voluntarily to . . . speak with them.

As to the specific abuse allegations, defendant indicated he was aware of the consequences of having a sexual relationship with Odele, stating occasionally that such a relationship would be "crazy . . . and during each of the

13

statements he held out his wrists to emphasize to the officers that he knew that if he had a sexual relationship with [Odele] that he would be taken away in handcuffs." In sum, the court found the State met its burden in showing that defendant knowingly, voluntarily, and intelligently waived his Miranda rights.

B.

The Fifth Amendment of the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Inherent in every Fifth Amendment analysis is the question of whether the [witness or suspect's] statement was voluntary, and, independently, whether the law enforcement officers taking it complied with Miranda." State v. W.B., 205 N.J. 588, 605 (2011) (citing State v. Nyhammer, 197 N.J. 383, 399-400 (2009)). The suspect must be clearly and unequivocally informed of their right to remain silent and to have an attorney present during the interrogation. Miranda, 384 U.S. at 467-68, 470. If the suspect consents to proceed with the interrogation, his or her right to remain silent must be "knowingly and intelligently waived." Id. at 475. The State has the affirmative duty to prove beyond a reasonable doubt that the statement was voluntary given. W.B., 205 N.J. at 602 n.3.

If the suspect invokes the right to remain silent, that invocation must be "scrupulously honored."  State v. Hartley, 103 N.J. 252, 256 (1986) (citing Michigan v. Mosley, 423 U.S. 96 (1975)).  Whether a defendant invoked the right to remain silent will be determined under the totality of the circumstances.  State v. Maltese, 222 N.J. 525, 545 (2015).  Any evidence obtained in violation of Miranda must be suppressed at trial.  Hartley, 103 N.J. at 262.  New Jersey's application of Miranda stems from our common law and is "treated . . . as though it were of constitutional magnitude, finding that it offers broader protection than its Fifth Amendment federal counterpart."  State v. O'Neill, 193 N.J. 148, 176-77 (2007).

## C.

Defendant maintains the State failed to prove that he knowingly and voluntarily waived his Miranda rights because the interviews were conducted without being asked if he could read English despite stating that he "sometimes" had trouble understanding it.  He further argues the detectives lied to him about wanting to discuss a "civil matter" and "failed to clarify that [his] statements would be used against him in a criminal . . . case."  This was especially erroneous, he claims, because as "a non-native English speaker with no experience with the criminal justice system, [he was unable] to parse the . . .

15

Miranda warnings . . . [and had to] rely on the detectives' explanations of those warnings."

Based upon our "'searching and critical' review of the record to ensure protection of . . . defendant's constitutional rights[,]" State v. L.H., 239 N.J. 22, 47 (2019) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)), we see no cause to upset the "trial court's factual findings concerning the voluntariness of [his statements] that are based on sufficient credible evidence in the record[,]" Ibid. On two separate occasions, defendant freely went to the police station. He made statements after he knowingly and voluntarily waived his right to be silent and have counsel. The detectives fully explained the Miranda rights form to him. At the time, defendant had lived in this country for fifteen years and was comfortably conversant in English before and during the interviews. There is nothing in the record suggesting he did not understand he had a right not to speak to the police without counsel and that his statements could be used against him.

Defendant's reliance on State v. Sims, 466 N.J. Super. 346 (App. Div. 2021) to establish the detectives failed to ensure he "fully understood his constitutional rights" is misplaced. There, we held rulings in State v. A.G.D, 466 N.J. Super. 346 (App. Div. 2021) and State v. Vincenty, 237 N.J. 122 (2019), that police are required to inform a defendant of specific charges filed

against him before waiving his Miranda rights prior to a custodial interrogation, also applied to an interrogated person who was arrested and questioned prior to charges being formally filed. Sims, 466 N.J. Super. at 367. The defendant in Sims was not informed about any of the charges filed against him or why he was being arrested when "[t]he officers 'secured [the defendant] in handcuffs, patted him down, and told [the defendant] [he] would be transport[ed].'" Id. at 357. The defendant was also informed by one of the officers that he was, in fact, under arrest. Id. at 358.

Defendant maintains Sims is analogous to his case because the detectives "intentionally misled [him] about why they wanted to speak with him," specifically when the detectives ostensibly wanted to speak with him about the disputed ownership of the tools in the van or, as he put it, a "civil matter." Even though they told him they wanted to speak about the tools, it became abundantly clear during the interview that they wanted to discuss his conduct towards Odele, to which he had the right to stop the interview at any point according to the given directions. Moreover, there was no indication that was lied to in order to induce him to waive his Miranda rights.

When assessing the totality of the circumstances surrounding defendant's statements to police and applying our standard of review, the trial court did not err in denying his motion to suppress statements.

II.

A.

Because they are relevant to defendant's contentions concerning the jury instructions and Bert's fresh complaint testimony, we briefly summarize the testimony provided by Odele, Bert, and Terri.

Odele was twenty years old when she testified. She was about eleven to twelve years old when defendant, who was in a relationship with her mother, began living with her family. He began touching her when she was thirteen to fourteen years old, which continued until she was eighteen years old. After her mother fell asleep at night, he would grab her breasts and buttocks, and try to rub his hands over her panties. He initially began touching Odele over her clothing, but "[t]here [were] many times" when he tried to touch her underneath her clothing. She stopped him from getting underneath her clothing by yelling at him or pushing him away and denied ever asking him to massage touch her.

18

Odele told Bert about defendant's touching because she was comfortable with him and believed he would not judge or think differently of her. She believed defendant stopped touching her because she had gotten her first tattoo, which he disliked. After turning eighteen, she told her mother about his abuse in March 2016, and her mother told him to move out.

Odele also testified about defendant's handwritten note in Spanish which was found in defendant's van. The letter read:

> Part [One][,] [three] whistles[,] [seven] times. [Odele], as the cigar is consumed so will you be consumed by love for me. Part [Two][,] Listen to the cigar [ten], [nine], [eight], [seven], [six], [five], [four], [three], [two], [one]. Part [Three][,] [w]itches and [w]arlocks help me so that [Odele] won't stop thinking about me. Through this prayer that my name is [defendant][,] the only person in her thoughts[,] may she sleep thinking and remembering me and I may call[,] may she tell me to be . . . with her forever . . . [Odele].

She felt "[g]ross, like [she] meant nothing . . . like a slut" by defendant touching her and was deeply sickened by his letter.

Based on the court granting the State's motion allowing Bert to provide fresh complaint testimony, Bert testified that Odele told him defendant would touch her in a sexual manner almost daily. Odele mentioned in October 2015 that defendant would enter her room between 1:00 a.m. and 3:00 a.m. to turn off the television after she had fallen asleep and would touch her.

19

Bert also observed and heard defendant's abuse of Odele. When he visited Odele during the daytime, he would hear defendant enter her bedroom and would then hear her say "leave me alone[,] or knock it off, don't do that, things along those lines." He also heard Odele make similar remarks to defendant upstairs while he was in the bathroom.

Bert was also present with Odele when her mother found the letter and envelope in defendant's van. He remarked the envelope contained photos from Facebook of Odele and him together, but his pictures were removed.

Terri testified on behalf of defendant. She told him to leave their marital home around March 31, 2016, after Odele texted her that he sexually abused her. She testified that Odele and defendant did not get along and that Odele did not want to be alone with him. She divorced him after they had been married for shortly over four years.

## B.

Defendant argues that when the trial court instructed the jury it had to determine the credibility of his statements to the police, the court erred in not directing the jury to examine the <u>Miranda</u> colloquy, his understanding of his rights and questions from the detectives, and whether his command of English affected the meaning and trustworthiness of his statements. He contends the

jury, with proper direction, would have determined his statements were "a product of misunderstanding and miscommunication rather than an admission of unlawful sexual contact."

Defendant further maintains the court did not instruct the jury to disregard any portions of his statements that were not credible as required by the second of the two-part inquiry required by State v. Hampton, 61 N.J. 250, 272 (1972). Because he did not object to the jury charge pursuant to Rule 1:7-2, we consider his argument under plain error, meaning we disregard any error or omission by the court "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see also State v. Hock, 54 N.J. 526, 538 (1969) (noting the "legal impropriety in the charge" must be "sufficiently grievous . . . to convince the court that of itself the error possessed a clear capacity to bring about an unjust result").

A trial court should provide a Hampton charge "whenever a defendant's oral or written statements, admissions, or confessions are introduced in evidence" regardless of whether the charge is requested. State v. Jordan, 147 N.J. 409, 425 (1997). A jury "shall be instructed that they should decide whether . . . the defendant's [statement] is true[,]" and if they conclude that it is "not true, then they must . . . disregard it for purposes of discharging their

function as fact finders on the ultimate issue of guilt or innocence." Hampton, 61 N.J. at 272. The failure to give the charge, however, is not always reversible error. Jordan, 147 N.J. at 425. We will only reverse when omission of the charge was clearly capable of producing an unjust result in the context of the entire case. Id. at 425, 429. If the statements were "unnecessary to prove [the] defendant's guilt because there is other evidence that clearly establishes guilt, or if the defendant has acknowledged the truth of his statement, the failure to give a Hampton charge" will not require reversal. Id. at 425-26.

There was no plain error warranting vacation of defendant's convictions. The court gave detailed instructions on assessing the credibility of his statements:

> There is for your consideration in this case a recorded statement allegedly made by . . . defendant and actually there were two. It is your function to determine whether or not the statements were actually made by . . . defendant[,] and if made, whether the statement or . . . any portion of them is credible.

> You may consider all of the circumstances surrounding the statements in making that determination with the following caution: I instruct you that in this case[,] certain portions of the recorded statement have not been provided to you[,] and you may only consider those portions of the statement which have been admitted in evidence and must not speculate as to the contents of the admission or the reason or reasons for the admission.

The court did not instruct the jury that, if they find defendant's statements are false "they must . . . disregard [them] for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence."  Hampton, 61 N.J. at 272.  This was not a fatal flaw given the court's instruction of Model Jury Charge (Criminal), "Criminal Final Charge - Credibility of Witnesses." (rev. May 12, 2014), when it stated:

> As the judges of the facts, you are to determine the credibility of the witnesses and in determining whether a witness is worthy of belief and therefore credible, you may take into consideration the following:  the appearance and demeanor of the witness, the manner in which he or she may have testified, the witness's interest in the outcome of the trial, if any, his or her means of obtaining knowledge of the facts,  the witness's power of discernment, meaning his or her judgment or understanding, his or her ability to reason, observe, recollect and relate, the possible bias, if any, in favor of the side for whom the witness  testified, the extent to which, if at all, each witness is either corroborated or contradicted, supported or discredited by other evidence, whether the witness testified with an intent to deceive you, the reasonableness or unreasonableness of the testimony the witness has given,  whether the witness made any inconsistent or contradictory statements and any and all other matters in the evidence[,] which serve to support or discredit his or her testimony.
>
> Through this analysis as judges of the facts, you weigh the testimony of each witness and then determine the

weight to give to it. Through that process you may accept all of it, a portion of it or none of it.

Moreover, even if the jury found defendant's statements were not true, there was, as in Jordan, other significant evidence that clearly established his guilt based on the testimony of Odele and Bert, together with the documentary evidence found in the van.

## C.

Defendant argues Bert's testimony—Odele told him about defendant's unwanted sexual touching—exceeded the narrow scope of the fresh complaint rule because Bert significantly detailed the allegations by stating he would often grope Odele in her room, that he would touch her at night, and that he would use the subterfuge of turning off her television to enter her bedroom to touch her. According to defendant, the risk associated with admitting the additional details from Bert's testimony was that the jury used it to corroborate and improperly bolster Odele's testimony rather than for the limited purpose contemplated by the fresh complaint rule. Defendant also argues the State violated the principle set forth in State v. R.K., 220 N.J. 444, 456 (2015), that it could not make an argument unsupported by the record when it claimed in summation that Odele's

24

complaint to Bert was "corroboration" of defendant's guilt.  Since he failed to raise this argument before the trial court, we review it for plain error.

Under the fresh complaint rule, the State can present "evidence of a victim's complaint of sexual abuse, [which is] otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated."  Id. at 455.  The rule's purpose "is to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime."  State v. Bethune, 121 N.J. 137, 146 (1990).  We review the admissibility of fresh complaint evidence under an abuse of discretion standard.  State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002) (citing State v. Hill, 121 N.J. 150, 167-68 (1990)).

There was no abuse of discretion in the admission of Bert's fresh complaint testimony.  The challenged testimony was properly admitted because it involved his first-hand account of seeing and hearing defendant's sexual misconduct towards Odele.  The testimony was not plain error because it was direct evidence, not hearsay, of his offenses.

As for the State's summation, the prosecutor commented that Bert and Terri corroborated that Odele was sexually abused by defendant.  Because Terri testified for the defense, there was no violation of the fresh complaint rule by

the State's reference to her testimony that Odele told her of defendant's abuse. And as noted, Bert's first-hand account of the abuse was an appropriate confirmation of Odele's allegations.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3301-18