# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1884-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KHALIL WHEELERWEAVER,

    Defendant-Appellant.

_____

Argued December 6, 2023 – Decided January 25, 2024

Before Judges Currier, Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-02-0547.

Stephen William Kirsch, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen William Kirsch, on the brief).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the brief).

PER CURIAM

Defendant Khalil Wheelerweaver[1] appeals his jury trial convictions for the murder of three women and the sexual assault and attempted murder of a fourth woman. He also was convicted of kidnapping, aggravated sexual assault, desecration of human remains, and aggravated arson, and was sentenced to an aggregate prison term of 160 years.

On appeal, defendant contends the charges involving each victim should have been tried separately. He argues the judge improperly instructed the jury on how to consider the evidence of the multiple criminal episodes. He also argues police violated his Fifth Amendment right to remain silent and the trial judge erred when he informed the jury on his ruling issued following the Miranda[2] hearing. Further, defendant contends his sentence is manifestly excessive. Based upon our review of the record, the parties' arguments, and the applicable legal principles, we affirm.

---

[1] Defendant's surname is also spelled as "Wheeler-Weaver" at times. However, the judgment of conviction and notice of appeal use the non-hyphenated spelling.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1884-21

I.

We discern the following pertinent facts from the record. We summarize the crimes in the chronological order in which they were committed.

Victim R.W.[3] (deceased)

On August 31, 2016, R.W. was walking with Breniesha Patterson and another woman on a street known for prostitution in Newark. They planned to engage in sex work. Patterson testified a car drove up and the driver "wanted" R.W., who got into the vehicle. Patterson told the driver, "[b]e careful with my sister because I love her," and "I'm going to take your license plate." She recorded the license plate number. R.W. sent Patterson a Facebook message twenty minutes later. Patterson never heard from R.W. again. Patterson reported R.W. missing on September 2, 2016. She provided police with the license plate number of the car R.W. entered.

On September 1, 2016, firefighters responded to a fire at an abandoned house on Lakeside Avenue in Orange. It took several hours to get the fire under control. Investigators found badly burned human remains inside the house. Dental records confirmed the burned body was R.W. An expert testified the cause of death was asphyxia due to strangulation. There was no soot in her

---

[3] We use initials to protect the victims' privacy. R. 1:38-3(c)(12).

airways, indicating R.W. was dead before the fire began. The investigation into the cause of the fire revealed there was no gas, electricity, or stove in the house. There was evidence of squatters, trespassing, and drug use.

On September 7, 2016, Detective Sergio Pereira of the Union Township Police Department was conducting the missing persons investigation. He determined the license plate number provided by Patterson was linked to defendant's car. Pereira went to defendant's residence and showed him a photograph of R.W. Defendant admitted he was with R.W. on August 31. Defendant explained he was driving in Newark and saw R.W. He said she wanted pizza, so he offered to drive her to a store. R.W. asked defendant if she could stay with him. He said no, but told her about an abandoned house in Orange where people stayed. He claimed he dropped her off at that location. Defendant volunteered to take the officers there. However, he took them to a different address than the house that was set on fire.

Defendant's phone records revealed he was near the location of the fire on August 31. His phone records also showed defendant searched the internet for missing persons in Union County, his home address, and "can text apps be traced."

A-1884-21

<u>Victim J.B. (deceased)</u>

On October 22, 2016, J.B. and her long-time friend, Amina Nobles, were on Frelinghuysen and Evergreen Avenues in Newark near a fast-food restaurant. J.B. let another friend use her phone, and then left the area. J.B. later called Nobles from someone else's phone—which was later shown in phone records to be defendant's phone. Nobles testified J.B. seemed okay during the call. J.B. told Nobles she expected to be gone for an hour. She never returned. Later that day, Nobles received a call from the number J.B. used earlier. The caller did not speak. A missing persons report was filed a few days later.

On December 5, 2016, two construction workers went to an abandoned house on Highland Ave in Orange to write a contract for repairs. They discovered J.B.'s body inside. A jacket was wrapped around J.B.'s face and neck area. Her face was covered with duct tape from the nose down. The medical examiner determined the cause of death was mechanical asphyxiation.

Phone records indicate defendant called Nobles on October 22, 2016. Defendant also called J.B. four times that day. Defendant's phone records confirmed he was near the fast-food restaurant in Newark and then the abandoned house.

A-1884-21

In the days leading up to J.B.'s disappearance, defendant conducted the following searches on the internet: "Walgreen needles," "what stores that sell syringes," "drug that put you to sleep instantly," "homemade poison," and "how do you make deadly poisons out of common household objects."

Victim T.T. (survived)

T.T. had been introduced to defendant by a former friend. In April 2016, defendant texted her and offered money for sex. T.T. went to defendant's home. He gave her the money upfront. She told defendant she had to go to her car to retrieve a condom but left and never returned.

In November 2016, T.T. was staying at a motel in Elizabeth. She was pregnant and no longer engaging in prostitution. She was, however, "conning" prospective "tricks," that is, "[s]omeone who gives money for sex."

On November 15, 2016, defendant reached out to T.T. She decided to try to con him and take his money. Defendant arrived at the motel wearing all black and what T.T. described as "half a mask thing." He was also wearing gloves and a hat with his hood over it. T.T. did not find this unusual because it was November.

T.T. and defendant did not have identification, which prevented them from getting a motel room. T.T. told him they might be able to get a room at a

6

different motel without having to produce identification. She then went to her room to get the keys to her friend Arnold's car. T.T. left her phone in the room.

T.T. and defendant drove to a gas station and then to a motel in Linden. T.T. exited the car and asked motel staff about getting a room, but the cost was too high. Defendant waited in the car. As they pulled out of motel parking lot, defendant asked her to pull over to use the bathroom. She parked the car on a side street and defendant got out to relieve himself.

T.T. testified it was a "blur" after defendant got back to the car. She thinks he hit her over the head. She woke up in the back seat. T.T. said defendant was "raping [her] from behind and then choking [her] out at the same time." She passed out and woke up "about three times all together" because of the strangling. T.T. tried to scratch defendant's face. He then put her hands behind her back, handcuffed her, and duct-taped her nose and mouth.

At some point, defendant moved to the front seat and took off his mask. He asked T.T. if she remembered him. He reminded her she had previously taken his money. Because the duct tape loosened from her crying and sweating, she was able to speak. She told defendant she left her phone with his text messages in her room. Defendant replied, "[o]h, no, we got to go back and get

A-1884-21

that phone." She told him if he took her back to her room, she would have Arnold pay him if he let them go.

On the way back to the first motel, T.T. slipped out of one of the handcuffs. She testified defendant wanted her:

> to go upstairs, grab the phone. He was going to follow at a distance behind me, have the old man [Arnold] come out, come downstairs, get in the car. He was going to follow and from there he was going to take us to [an] ATM and take us to a secluded area and then let us go.

T.T. kicked on the door. When Arnold opened it, she entered and locked the door behind her. After banging on the door, defendant ran off. Arnold called 9-1-1. T.T. told the operator she had been kidnapped. She told responding officers defendant kidnapped, choked, and duct taped her.

Phone location data showed defendant's phone was at the motel where T.T. was staying between 7:51 p.m. and 8:04 p.m. on November 15, was at the gas station between 8:07 p.m. and 8:11 p.m., was at the motel in Linden, and then returned to T.T.'s motel. T.T. made a positive in-court identification of defendant.

8

<u>Victim S.B. (deceased)</u>

On November 19, 2016, defendant texted S.B., "[d]o you want to make money?" and "[s]ex for money?" S.B. replied, "[h]ow much money?" She later texted, "[t]o f*** me, 500."

S.B.'s phone records revealed defendant agreed to pick her up in Jersey City, where she went to school, drive her to his house and bring her back after. S.B. asked if he would pay her first. He responded he would pay her at his house. She then texted, "[y]ou're not a serial killer, right? LMAO [laughing my ass off]?" Defendant responded, "no" and she replied, "[o]kay, cool." The planned rendezvous on November 19 never occurred.

On November 21, defendant texted S.B., "[w]assup." She responded, "[s]orry about the other day" and "I got really nervous."

On November 22, S.B.'s mother picked her up from school. Later that night, S.B. drove her mother's van to visit a friend. She told her mother she would be right back, but never returned. Her body was later found at Eagle Rock Reservation in West Orange.

A convenience store's surveillance video showed defendant get out of S.B.'s mother's van and enter the store. S.B. remained in the van on her phone.

A-1884-21

Lamia Brown, S.B.'s friend, contacted her on the day S.B. disappeared. S.B. used an app called "Tagged," which Lamina described as an app that "just let's you connect with local people." Lamia[4] testified S.B. was communicating with somebody on Tagged leading up to November 22. The last time Lamia spoke with S.B. was on November 22 at 10:04 p.m.

On November 23, S.B.'s mother went to Lamia's place of employment and said she had not spoken to her daughter all day. They filed a police report that day.

Detective Pierre Falaise from the Montclair Police testified S.B.'s mother's van was found on November 25 in the rear of a lot on Nassau Street in Orange. Defendant lived about five or six blocks away from where the van was discovered. Lamia testified S.B. was wearing red hair extensions on the day she disappeared. In the van, police found a black purse with S.B.'s property in it, a condom box, and a cigar. In the lot, they found a hair extension and clear tape with red hair stuck on it. S.B.'s hair extension had high levels of saliva in it.

S.B.'s sister testified she, Lamia, and a friend, Samantha Rivera, searched S.B.'s computer. Rivera created a profile on Tagged. "Lilyachtrock," an account

---

[4] Because Lamia Brown coincidently shares the same last name with one of the victims, we use her first name to avoid confusion. We mean no disrespect in doing so.

who contacted S.B. before her disappearance, contacted Rivera. Rivera and Lamia conversed with Lilyachtrock—later revealed to be defendant—to "see if anything was similar, to just see if we can locate, find clues." They arranged to meet defendant at a restaurant in Glen Ridge. The women alerted Montclair police about their plan.

When defendant arrived at the restaurant, police approached him. They told defendant they wanted to speak with him because he may have been one of the last people to speak with a missing person—S.B. Defendant agreed to go to police headquarters and speak with police. Detective Falaise testified police were investigating a missing persons report at the time and did not know S.B. was dead. For that reason, the conversation with defendant was not recorded. Defendant was not confined or restrained.

Falaise testified defendant said he had met S.B. at New Jersey City University. Defendant messaged her on Tagged after recognizing her. He told police he wanted to see if she used the app to solicit money for sex. Defendant admitted he was "lilyachtrock" but said the profile photo was a picture of his stepbrother. He created the account using the email address of pimpkillerghost@yahoo.com.

Defendant told police that on the night of November 22, S.B. picked him up from the Orange Commons parking lot. She asked if he wanted to smoke, but he did not. S.B. then went into a building to purchase marijuana. After driving around, defendant said S.B. picked up another man. S.B. and the other man were smoking so defendant asked her to bring him back to Orange Commons. On the drive back, defendant received a text from his friend, Richard Isaacs, at 8:17 p.m. S.B. dropped defendant off at Orange Commons. Defendant told police the other man did not exit the car, but instead moved to the front seat. Defendant claimed he never heard from S.B. again.

On November 29, defendant rode with police to show them the route S.B. took on the night she disappeared. Defendant was free to leave and was not placed in handcuffs. During the drive, defendant pointed out a car and explained he and Isaacs were working on it after S.B. dropped him off that night.

On December 1, 2016, police found S.B.'s body covered with sticks and brush in a wooded area in the Eagle Rock Reservation. A pair of sweatpants were wrapped around her neck. A medical examiner testified S.B.'s cause of death was compression of the neck.

Police interviewed Isaacs. Originally, he told police he was working on cars with defendant on the night of November 22. He later admitted this was a

12

lie. He testified he told police he was with defendant on multiple occasions because, "I was covering for him, saying I was with him."

Phone records show defendant's phone was near High Point Pavilion and Eagle Rock Reservation from 10:38 p.m. until 12:43 a.m. on November 23. On November 23, defendant searched: "how to remove Apple i.d. from iPhone 6" and "factory reset iPhone to remove Apple i.d." on his phone. On August 27, 2016, he searched for "Eagle Rock Reservation, New Jersey."

Evidence Found in Defendant's Residence and Car

On December 6, 2016, police conducted a search of defendant's home and car. In defendant's house, police found a pair of black and yellow gloves, a black hat, a black Nike sweatshirt, black Nike sweatpants, black sneakers, and three cell phones. In his car, police found a pair of black gloves, plastic wire ties, pepper spray, a first aid kit, and a "body fluid cleaner kit."

Defendant's Statements

On December 6, defendant spoke with Essex County detectives, who told defendant they knew he was not with Isaacs on November 22 because of his phone records. Defendant admitted he lied to them and that he had previously lied to Montclair police. After learning he was captured on a convenience store's

13

surveillance camera, defendant admitted to visiting the store with S.B. on the night she disappeared.

Defendant told detectives he bought a box of condoms, cigars, a rollup and maybe something to drink. He also admitted to having sex with S.B. that night. After leaving the convenience store, defendant said they went to get marijuana, picked up her friend in Newark, and went to the reservation. At first, defendant claimed they had a "threesome," but then changed his story. He said the other man had sex with S.B. first, after which defendant had sex with her. He claimed S.B. then dropped him off at the same street she had picked him up from. Defendant denied any involvement in R.W.'s death and the fire that burned her remains.

In 2017, defendant was charged by indictment with three counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1); three counts of second-degree disturbing human remains, N.J.S.A. 2C:22-1(a); second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(1); first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1); first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1); and two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3).

In August 2018, the court granted the State's motion to admit defendant's statements to police, rejecting defendant's contention police violated his

<u>Miranda</u> rights.  The court also denied defendant's motion to sever the case into four separate trials.

Defendant's trial was held over the course of eight weeks in October through December 2019.  A different judge presided over the trial than the judge who decided the <u>Miranda</u> and severance motions.  Defendant was convicted of all counts and sentenced to 160 years in prison with 145 years of parole ineligibility.  This appeal follows.

Defendant raises the following contentions for our consideration:

POINT I

THE MOTION FOR SEVERANCE SHOULD HAVE BEEN GRANTED.  JOINDER OF THESE FOUR SEPARATE SETS OF ALLEGATIONS FOR TRIAL WAS NOT WARRANTED BY THE CASE LAW, WAS TOO UNDULY PREJUDICIAL, AND DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL; ALTERNATIVELY, AN N.J.R.E. 404(B) LIMITING INSTRUCTION SHOULD HAVE BEEN GIVEN ON THE PROPER AND IMPROPER USE OF THE JOINED COUNTS AGAINST ONE ANOTHER.

POINT II

THE DEFENDANT'S DECEMBER 6, 2016 STATEMENT TO POLICE SHOULD HAVE BEEN SUPPRESSED BECAUSE, AFTER VIOLATING STATE V. VINCENTY, POLICE THEN IGNORED DEFENDANT'S INVOCATION OF HIS RIGHT TO SILENCE AND GOADED HIM INTO SPEAKING BY TELLING HIM ABOUT THE CHARGES THAT

15

WERE BEING FILED AGAINST HIM <u>AFTER</u> HE HAD INVOKED HIS RIGHT TO SILENCE.

POINT III

THE JUDGE IMPROPERLY IMPINGED ON DEFENDANT'S DUE-PROCESS RIGHTS AND HIS RIGHT TO AN IMPARTIAL JURY—IN DIRECT VIOLATION OF <u>STATE V. HAMPTON</u> AND <u>N.J.R.E.</u> 104(C)—WHEN HE TOLD JURORS THAT HE HAD FOUND DEFENDANT'S STATEMENTS TO POLICE TO BE VOLUNTARY AND ADMISSIBLE.

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

II.

We first address defendant's contention the trial court erred by denying his motion for severance. Recently, we summarized the rules governing joinder and severance in <u>State v. Smith</u>, 471 N.J. Super. 548 (App. Div. 2022). Former Chief Appellate Judge Messano explained:

> <u>Rule</u> 3:7-6 permits the joinder of offenses in a single indictment for a single trial if they are of a "same or similar character <u>or</u> are based on the same act or transaction <u>or</u> on [two] or more acts or transactions connected together <u>or</u> constituting parts of a common scheme or plan." (Emphasis added). "Charges need not be identical to qualify as 'similar' for purposes of joinder under <u>Rule</u> 3:7-6," [State v.] <u>Sterling</u>, 215 N.J. [65] at 91 [2013] (citing <u>State v. Baker</u>, 49 N.J. 103, 105 (1967)), but they must be "connected together," <u>id.</u>

16

215 N.J. at 91, or be "parts of a common scheme or plan," id. 215 N.J. at 72.

[Id. at 575.]

Judge Messano added, "[t]he preference is for joinder of the offenses in a single trial unless the defendant demonstrates prejudice." Ibid. (citing State v. Chenique-Puey, 145 N.J. 334, 341 (1996)); see also R. 3:15-2(b) (providing for relief from prejudicial joinder in criminal trials).

In Sterling, our Supreme Court explained "[t]he test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" 215 N.J. at 73 (quoting Chenique- Puey, 145 N.J. at 341).

In State v. Cofield, the Court established a multi-factor test to determine when and in what circumstances "other crimes" evidence is admissible in a criminal trial. 127 N.J. 328, 338 (1992). The Cofield factors are:

> (1) The evidence of the other crime must be admissible as relevant to a material issue; (2) It must be similar in kind and reasonably close in time to the offense charged; (3) The evidence of the other crime must be clear and convincing; and (4) The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid.]

Here, the motion judge made specific <u>Cofield</u> findings, stating:

> I find pursuant to <u>Cofield</u> that the subject evidence—
> that the evidence, I should say of each killing and
> related charges can be properly admitted in the trial of
> the other for the following reasons: the evidence of each
> murder or killing, or related charges is relevant to show
> a common scheme or plan, motive, and as a signature
> crime evidence. As argued by the State as to motive,
> the four incidents support motive evidence for one
> another. Viewing one of the homicides in isolation, it
> would be difficult to comprehend, for example, why the
> defendant would want to kill [S.B]. To place it in the
> context with the other strangulation, murders of sex
> workers the motive comes clear. Also as argued by the
> State, defendant's signature crime here is to prey on
> those vulnerable women who due to their occupations
> in the sex worker industry perhaps are seen by society
> at large to be disposable. I also note as to each victim
> they were targeted for who they were and what they did
> for money. They were killed in the same manner,
> noting at least two[,] [S.B.]and [J.B.], strangled with
> articles of clothing, [R.W.], although strangled as well,
> but because of the fire allegedly set by the defendant
> destroyed any articles of clothing that may have been
> around her neck. I also note that T.T. was being
> strangled while being raped and handcuffed when she
> managed to interrupt the attack. I find that these
> murders or attempted murders are sufficiently unique in
> terms of the combined similarities, in victim, cause, and
> manner of death. The signature of clothing, articles of
> clothing around the next, desecration or concealment of
> body remains, and again as noted earlier, even the
> proffered alibi that can be used by the jury to make an
> inference with regard to identify as opposed to mere
> propensity. Reference again is made to [<u>Cofield,</u>] 127
> N.J. 236.

The judge also noted the four episodes occurred over the course of approximately three months. The judge found the evidence of each crime clear and convincing, and the probative value outweighed any potential for prejudice to defendant. The judge also noted "that much, if not all" of the State's evidence overlapped. The overlapping evidence included defendant's <u>Miranda</u> statements, which referred to three murders; the alibis defendant offered in regard to R.W. and S.B. both involved working on cars with Isaacs; and defendant encouraged Isaacs to support a false alibi.

We are not convinced the similarities between the four criminal episodes are sufficient to constitute a "signature." <u>See</u> <u>Sterling</u>, 215 N.J. at 97 (noting,"[a]lthough there were some similarities between the burglaries and sexual assaults" involving the two victims, "there is no uniqueness to the manner in which those crimes were committed"). We are satisfied, however, the severance motion judge acted within his discretion in finding there was a common plan or scheme connecting the four criminal episodes. In this instance, defendant's common scheme or plan was to solicit sex workers, strangle them, and destroy or dispose their remains.

We add this was not a situation involving two similar criminal episodes. <u>See</u> <u>State v. Lumumba</u>, 253 N.J. Super. 375 (App. Div. 1992). Here, the

19

evidence shows defendant is a <u>serial</u> murderer; he targeted four sex workers over the course of a few months. The repetition of similar circumstances shows this was no mere coincidence but rather a pattern of recurring behavior that evinces a common plan or scheme.

We are unpersuaded by counsel's contention at oral argument that a common plan or scheme must be corroborated by some form of extrinsic proof, such as an admission or statements made to confederates or others. A common plan or scheme for purposes of N.J.R.E. 404(b) and <u>Rules</u> 3:7-6 and 3:15-2(b) does not require direct evidence of a conspiracy or joint venture. An individual acting alone can have a common plan or scheme to commit a series of crimes notwithstanding the "plan" is not articulated to others. Stated another way, the common plan or scheme can be proved circumstantially from the nature and circumstances of multiple episodes.

Finally, we reiterate and stress "[t]he decision to sever is within the trial court's discretion, and it will be reversed only if it constitutes an abuse of discretion." <u>State v. Weaver</u>, 219 N.J. 131, 149 (2014); <u>see also</u> <u>State v. Sterling</u>, 215 N.J. 65, 72-73 (2013). We decline to substitute our judgment for the trial court's judgment in evaluating the <u>Cofield</u> factors and in gauging the prejudice inherent in joining like offenses. Although the evidence defendant committed

multiple crimes is inherently prejudicial, "it was prejudicial in the way that all highly probative evidence is prejudicial: because it tends to prove a material issue in dispute." State v. Rose, 206 N.J. 141, 164 (2011).

III.

We turn next to defendant's contention, raised for the first time on appeal, "a[] N.J.R.E. 404(B) limiting instruction should have been given on the proper and improper use of the joined counts against one another."  The trial judge instructed the jury:

> There are [eleven]offenses charged in the indictment. They are separate offenses by separate counts in the indictment . . . In your determination of whether the State has proven the defendant guilty of the crimes charged in the indictment beyond a reasonable doubt, the defendant is entitled to have each count considered separately by the evidence which is relevant and material to that particular charge based on the law as I will give it to you.

On appeal, defendant relies on the general proposition that "if Rule 404(b) evidence is admitted at trial, the judge is required to provide a 'carefully crafted limiting instruction . . . explain[ing] to the jury the limited purpose for which the other-crime evidence is being offered' . . . and 'setting forth the prohibited and permitted purposes of the evidence.'"  State v. Smith, 471 N.J. Super. 548, 577 (App. Div. 2022).  That general principle is based on the notion that "[i]t is

the danger that other-crimes evidence may indelibly brand the defendant as a bad person and blind the jury from a careful consideration of the elements of the charged offense that requires the trial court to deliver the limiting instructions in a way that the jury can readily understand." State v. Blakney, 189 N.J. 88, 93 (2006).

Importantly, however, in Smith, we acknowledged, "[w]e know of no reported case that requires similar instructions be given when two different sets of charges are tried together." 471 N.J. Super. at 577. Here, the trial evidence pertaining to the four criminal episodes was not "other crimes" evidence within the meaning of Rule 404(b). It was admitted to prove indicted charges that were before the jury to decide. In these circumstances, we conclude the trial judge's jury instruction that "the defendant is entitled to have each count considered separately by the evidence which is relevant and material to that particular charge based on the law as I will give it to you" was adequate. See State v. Pitts, 116 N.J. 580, 603 (1989). We add defendant did not object to that instruction. See State v. Montalvo, 229 N.J. 300, 320 (2017) ("Without an objection at the time a jury instruction is given, 'there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case.'") (quoting State v.

22

Singleton, 211 N.J. 157, 182 (2012)); see R. 1:7-2 (plain error rule); see also State v. Funderburg, 225 N.J. 66, 79 (2016).

IV.

Defendant next argues detectives violated his Fifth Amendment rights, first by failing to advise him of the charges he was facing when they administered Miranda warnings, and thereafter by failing to scrupulously honor his assertion of the right to remain silent. We begin our analysis by recounting the relevant facts adduced at the suppression hearing.

On December 6th, 2016, defendant was transported to the Essex County Homicide Task Force for a DNA buccal swab. Defendant's interaction with detectives in the interrogation room was electronically recorded. We refer to the time stamps on the video to provide context for the sequence of events.

Officers first inquired about defendant's identity, age, address, education, and employment status at 19:25:50. Defendant was then advised of his Miranda rights at 19:27:12. Defendant stated he did not wish to talk to the police. The detectives stopped questioning him. They advised defendant they had a court order to obtain a DNA sample and began taking his sample at 19:30:05. After taking the sample, the detectives left the room.

Detective Christopher Smith consulted prosecutors who authorized charges against defendant. A short time later, at 19:48:12, Detective Smith returned to the interrogation room. He advised defendant he was under arrest and would be charged with murder and desecration of human remains. Defendant was then left alone in the room until he was removed for processing at 20:03:05.

While getting into the elevators with Detectives Herman Sherilian and Michael DiPrimio, defendant said, "[t]his shit is ridiculous. I didn't get to tell my side of the story." At first, Detective DiPrimio did not hear defendant. He asked defendant to repeat himself. Defendant repeated, "[t]his is ridiculous. I didn't get to tell my side of the story." DiPrimio asked defendant if he wanted to talk to the detectives, to which the defendant responded that he did. Defendant was brought back into the interrogation room at 20:05:38. He confirmed he wanted to speak with the detectives at 20:06:18. Defendant was re-read his <u>Miranda</u> rights at 20:08:43. He waived those rights and gave a statement.[5]

The judge hearing the suppression motion ruled:

---

[5] We have already recounted the gist of defendant's statement in our recitation of the facts adduced at trial.

> Based on my review of all of the aforementioned, I find that the … recording of the defendant's statement clearly demonstrates that [defendant] was advised of his <u>Miranda</u> Rights, understood them, and after initially invoking them, [defendant] re-initiated questioning and made a knowing, intelligent, and voluntary waiver of his <u>Miranda</u> Rights before providing a lengthy statement.

We need only briefly address defendant's contention the detectives violated his Fifth Amendment rights by failing to comply with the rule announced in <u>State v. Vincenty</u>, 237 N.J. 122 (2019). In <u>Vincenty</u>, detectives asked the defendant to waive his right against self-incrimination without informing him of charges filed against him. <u>Id.</u> at 135. The Court held "[w]ithholding that 'critically important information' deprived [the defendant] of the ability to knowingly and voluntarily waive the right against self-incrimination." <u>Ibid.</u> However, in <u>State v. Sims</u>, our Supreme Court declined to expand that requirement to apply to situations where a defendant has not yet been formally charged. 250 N.J. 189, 210-17 (2022). The Court rejected and reversed a new rule proposed by the Appellate Division "requiring officers to tell an arrestee, not subject to a complaint-warrant or arrest warrant, what charges he faces before interrogating him." <u>Id.</u> at 217.

Here, detectives administered the first set of <u>Miranda</u> warnings before defendant was charged with any offense. Detectives only received authorization

to apply for a murder complaint-warrant after defendant invoked his right to remain silent. Nor was defendant formally charged with murder by complaint-warrant when Miranda warnings were readministered. Although by that point, detectives had advised defendant they would be applying for a complaint-warrant charging murder.

We turn next to defendant's contention the detectives ignored his invocation of the right to remain silent and "goaded him into speaking by telling him about the charges that were being filed against him after he had invoked his right to silence."

The scope of our review of a decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). In Sims, our Supreme Court reaffirmed that "[w]hen we review a trial court's decision on a motion to suppress a defendant's statement, we defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." 250 N.J. at 210.

A defendant's decision to remain silent must be "scrupulously honored" by law enforcement. State v. Hartley, 103 N.J. 252, 261 (1986) (citations omitted); see also Michigan v. Mosley, 423 U.S. 96, 103 (1975). The "failure [to] scrupulously honor a previously-invoked right to silence renders

unconstitutionally compelled any resultant incriminating statement made in response to custodial interrogation." Ibid. Thus, "once a defendant clearly and unambiguously invokes his right to remain silent, interrogation must cease." State v. Maltese, 222 N.J. 525, 545 (2015).

"If a defendant initiates further police conversations after invoking his right to remain silent, the resumption of police questioning will not constitute a failure to scrupulously honor that right." State v. Mallon, 288 N.J. Super. 139, 147 (App. Div. 1996); see State v. Fuller, 118 N.J. 75, 83 (1990).

The record clearly shows the detectives did not 'interrogate' defendant by informing him he was going to be charged with murder. "[I]nterrogation refers to 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" State in Interest of A.A., 240 N.J. 341, 353-54 (2020) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). In State v. Mallozzi, we held that "informing defendant of the charges against him was not designed or done to elicit any type of response from defendant and thus places [the agent's] actions outside the Innis definition of 'interrogation.'" 246 N.J. Super 509, 516 (App. Div. 1991).

As in Mallozzi, telling defendant he was going to be charged with murder was not designed or reasonably likely to elicit an incriminating response. This conclusion is confirmed by the fact the detective left the interrogation room after he informed defendant of the impending charges. We conclude the detectives scrupulously honored defendant's invocation of the right to remain silent—a right he knowingly and voluntarily waived when he determined it would be in his best interest to tell his side of the story.

V.

Defendant next argues the trial judge violated the rule announced in State v. Hampton, 61 N.J. 250, 272 (1972), and codified in N.J.R.E. 104(c) when he instructed the jury regarding the pretrial ruling denying defendant's motion to suppress his statements to police. In Hampton, our Supreme Court held:

> [T]he trial court alone shall determine (1) whether the [Miranda] warnings were given to the accused and his rights thereunder waived by him before the confession was given; and that if it finds the warnings were not given, or if given the rights not waived, the confession must be excluded, and (2) if those conditions were satisfied, whether in light of all the circumstances attending the confession it was given voluntarily. If these questions are resolved in favor of the State, then, withou[t] being advised of the court's decision, the jury shall be instructed that they should decide whether in view of all the same circumstances the defendant's confession is true.

A-1884-21

[61 N.J. at 272.]

Rule 104(c) further states, "[i]f the court admits the statement the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible."

In this instance, the trial judge told the jury:

> In considering whether or not an oral statement was actually made by the defendant, and, if made, whether it is credible, you should receive, weigh, and consider the evidence with caution based on the generally recognized risk of misunderstanding by the hearer, or the ability of the hearer to recall accurately the words used by the defendant. The specific words used and the ability to remember them are important to the correct understanding of any oral communication because the presence or absence or change of a single word may substantially change the true meaning of even the shortest sentence. You should, therefore, receive, weigh, and consider such evidence with caution.
>
> . . . .
>
> The Court has previously ruled that Miranda warnings were not required for the taking of the alleged statement on September 7th, 2016; November 26th and 29th of 2016, as the defendant was not in custody on those dates. The Court has also previously ruled that defendant was properly advised of his Miranda rights and made a knowing, intelligent and voluntary waiver of those rights prior to allegedly giving the audio/video recorded statement on December 6th, 2016. If, after consideration of all of these factors, you determine that the statement was not actually made, then you must disregard the statement completely. If you find that the

statement was made, you may g[i]ve it the weight you think appropriate to the statement. If you find that the statement was made, but it was not truthful and/or credible and the defendant purposely gave a false statement knowing it was false, you may consider those false statements to show the defendant's consciousness of guilt.

The two sentences we have highlighted run afoul of the spirit if not the letter of Hampton and Rule 104(c). It bears noting, however, counsel did not object to the jury charge. See Montalvo, 229 N.J. at 320.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022); see also State v. Singh, 245 N.J. 1, 13 (2021). "The mere possibility of an unjust result is not enough." Funderburg, 225 N.J. at 79. "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Macon, 57 N.J. 325, 336 (1971))).

Here, although the two sentences we have highlighted were inappropriate, those remarks did not lead to an unjust result considering the strength of the evidence of defendant's guilt. "The very purpose of a Hampton charge is to call

the jury's attention to the possible unreliability of the alleged statements made by a criminal defendant." State v. Feaster, 156 N.J. 1, 72 (1998). In this instance, the interrogation was recorded and played to the jury. The major portion of the jury instruction we have reproduced properly tells the jury to "receive, weigh, and consider the evidence with caution." Accordingly, when viewed in context, we conclude the error does not rise to the level of plain error warranting reversal of defendant's trial convictions.

VI.

Finally, we address defendant's contention the sentence imposed is manifestly excessive. Defendant argues the trial judge failed to give proper weight to his lack of criminal history and his age and provided an inadequate explanation as to the overall fairness of his aggregate sentence. We disagree.

Our review of a trial court's imposition of sentence is limited. State v. Bolvito, 217 N.J. 221, 228 (2014). "[A]ppellate courts should not 'substitute their judgment for those of our sentencing courts. . . .'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). It is well-settled that "[o]nly when the facts and law show 'such a clear error of judgment that it shocks the judicial conscience' should a sentence be modified on appeal."

31

State v. Roach, 146 N.J. 208, 230 (1996) (quoting State v. Roth, 95 N.J. 334, 363-64 (1984)).

Here, the trial court found four aggravating factors applied: the nature and circumstances of the offenses, N.J.S.A. 2C:44-1(a)(1); the gravity and seriousness of the harm inflicted on the victim, N.J.S.A. 2C:44-1(a)(2); the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); and the need for deterring defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The judge also gave minimal weight to the mitigating factor of defendant having no prior criminal record, N.J.S.A. 2C:44-1(b)(7).

We see no abuse of discretion. The judge recounted the horrific facts of defendant's crimes. Affording more weight to defendant's lack of a criminal record would have made no difference in the ultimate balancing of aggravating and mitigating circumstances. See State v. Copling, 326 N.J. Super. 417, 440 (App. Div. 1999) (noting the "aggravating factors are sufficient to outweigh the single mitigating factor, particularly because, as the judge determined, the nature of the murder . . . was exceptionally heinous."). Under any conceivable circumstance, the aggravating factors would substantially outweigh the mitigating circumstances.

A-1884-21

We likewise reject defendant's argument the judge did not adequately articulate that the overall sentence was fair.  We note defendant does not challenge the sentencing court's decision to impose consecutive sentences pursuant to State v. Yarbough, 100 N.J. 627 (1985), holding modified by State v. Torres, 246 N.J. 246 (2021).  Rather, the gravamen of his argument is the trial judge failed to explain why the overall imprisonment and parole ineligibility terms are fair.

In State v. Cuff, our Supreme Court applied the Yarbough criteria to a defendant's lengthy sentence.  239 N.J. at 328. The Court stressed that a "sentencing court's focus 'should be on the fairness of the overall sentence.'" Id. at 352 (quoting State v. Miller, 108 N.J. 112, 121 (1987)).  The Court reiterated this principle in State v. Torres, holding a sentencing court "should focus on 'the fairness of the overall sentence,'" and "'should set forth in detail its reasons for concluding a particular sentence is warranted.'"  246 N.J. at 267-68 (quoting Miller, 108 N.J. at 122).

But "fairness of the overall sentence" is not a talismanic phrase that must invariably be recited verbatim.  Here, the trial judge explained why a 160-year prison term was warranted.  He stated, "[t]he purpose of this sentence again is

that this defendant never walks among society again." The judge also explained, "[t]he sentence justifies the actions of the defendant."

We conclude the reasons for imposing the aggregate sentence that were set forth by the trial judge in his comprehensive sentencing decision satisfy the foundational requirements of <u>Cuff</u> and <u>Torres</u>, especially in view of the <u>Torres</u> Court's recognition that "the severity of the crime is now the single most important factor in the sentencing process." <u>Id.</u> at 262 (quoting <u>State v. Hodge</u>, 95 N.J. 369, 378-79 (1984)). The <u>Torres</u> Court "reiterate[d] the repeated instruction that <u>a sentencing court's decision whether to impose consecutive sentences</u> should retain focus on 'the fairness of the overall sentence.'" <u>Id.</u> at 270 (quoting <u>Miller</u> 108 N.J. at 122). But as we have noted, defendant does not challenge the sentencing court's decision to impose consecutive sentences.

In sum, it is not necessary to remand for the trial court to recite an explicit "overall fairness" finding considering the entirety of the judge's sentencing ruling, which clearly shows the judge deemed the aggregate sentence to be necessary to serve the interests of justice. In the final analysis, the enormity of the sentence is amply justified by the horrific nature of defendant's crimes.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

34                                                          A-1884-21